**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Olayemi Dele JINADU (95–3833), Moruf Omotola Lawal (95–3900),**
**Defendants–Appellants.**

Nos. 95–3833, 95–3900.

United States Court of Appeals,
Sixth Circuit.

Submitted Sept. 23, 1996.

Decided Oct. 17, 1996.

Robert Brichler, Asst. U.S. Attorney (argued and briefed), Office of the U.S. Attorney, Cincinnati, OH, for U.S.

Charles H. Schaffner (briefed), Erlanger, KY, for Olayemi Dele Jinadu.

Robert A. Perez (argued and briefed), Cincinnati, OH, for Moruf Omotola Lawal.

Before MARTIN, Chief Judge; CONTIE, Circuit Judge; CARR, District Judge.*

CONTIE, Circuit Judge.

Defendant-appellant, Jinadu, appeals his conviction and sentence for conspiracy to import and to distribute heroin. For the following reasons, we affirm. Defendant-appellant, Lawal, appeals his conviction and sentence for conspiracy to import and to distribute heroin and for attempt to distribute heroin. We affirm in part and reverse in part.

## I.

On November 16, 1994, a five-count indictment was returned against defendants Moruf Omotola Lawal and Olayemi Dele Jinadu, and coconspirators Sherifkat Obihazar and Ferdinand Obasi. Count One charged that beginning sometime in 1991 until November 16, 1994, the four coconspirators conspired

---

* The Honorable James G. Carr, United States District Judge for the Northern District of Ohio, sitting by designation.

together to import and to attempt to import heroin originating in Bangkok, Thailand into the United States in violation of 21 U.S.C. §§ 952, 960 and 963. The indictment stated that it was part of the conspiracy that Obihazar, a Nigerian citizen, obtained heroin from Bangkok, Thailand and elsewhere and gave it to couriers for transportation to the United States or used the international mails to send heroin concealed within the cover of books. The indictment stated that it was part of the conspiracy that Lawal, Obasi, and Jinadu, who were living in Chicago, received heroin from couriers in Chicago, and traveled to Cincinnati, Ohio to pick up heroin sent from Obihazar to a person known to the grand jury.

Count Two of the indictment charged that beginning sometime in 1994 up to November 16, 1994, the four coconspirators conspired together to distribute heroin in violation of 21 U.S.C. §§ 846 and 841. Count Three charged that on or about October 27, 1994, the four coconspirators attempted to import into the United States in excess of one kilogram of heroin in violation of 21 U.S.C. §§ 952, 960(b)(1)(A), 963 and 18 U.S.C. § 2. Count Four charged that on November 7, 1994, Obasi and Jinadu unlawfully traveled from Illinois to Cincinnati, Ohio with the intent to import and distribute heroin in violation of 18 U.S.C. §§ 1952 and 2. Count Five charged that on November 7, 1994, Obihazar, Obasi, and Jinadu attempted to possess with intent to distribute in excess of one kilogram of heroin in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(i), 21 U.S.C. § 846, and 18 U.S.C. § 2.

The facts giving rise to this indictment were as follows. On October 27, 1994, a United States Customs inspector in San Francisco inspected an international mail parcel arriving from Jakarta, Indonesia and found it contained 1029 grams of heroin. The package was addressed to a post office box in Cincinnati, Ohio, and customs and post office officials arranged for a controlled delivery.

On November 2, 1994, Martina Murphy was arrested after she took delivery of the package and was followed back to her residence. Ms. Murphy immediately began to cooperate with the government, advising the United States that her fiance, Obihazar, had arranged for the parcel to be sent to her post office box in Cincinnati under a fictitious name. She received a telephone call from Obihazar about the parcel that day.

On November 3, 1994, the United States Customs Service in Oakland, California seized a second parcel addressed to the same post office box in Cincinnati. This parcel contained approximately 318.5 grams of heroin.

On November 4, 1994, Martina Murphy, acting in an undercover capacity, contacted Obihazar in Bangkok by telephone and advised him that she had received the second parcel. The next day, Obihazar called Ms. Murphy and advised her that his "guy" was in Cincinnati and was staying at the Quality Hotel, room No. 231. Obihazar instructed her to open the second parcel, remove the reference book, take the front and back off the book, and give him (the "guy" in room No. 231) the "things" in black.

Ms. Murphy cooperated with government agents and agreed to set up a controlled delivery of the second parcel, containing 318.5 grams of heroin on November 5, 1994. On that date, defendant Lawal occupied room No. 231 at the Quality Hotel under the fictitious name of Stephen Samuel. Ms. Murphy knocked on the door to the room, and defendant Lawal opened the door and took the package. After the package was delivered, agents from United States Customs, the Drug Enforcement Agency, and the Department of Alcohol, Tobacco and Firearms knocked on the door, entered, and placed defendant Lawal under arrest.

After Lawal was arrested, he initially agreed to cooperate with the United States. He received several telephone calls from Obihazar while at the hotel and was questioned initially by Bureau of Alcohol, Tobacco and Firearms Special Agent Terry Sullivan, and then by U.S. Customs Special Agent Jac Hein. Special Agent Hein died a few months later. Special Agent Sullivan, however, was available to testify at trial about Lawal's admissions made to Hein in his presence. Lawal admitted to Special Agent Hein that

he had been to Cincinnati before to pick up packages from Ms. Murphy and that he had given her money for Obihazar in exchange for the packages. Special Agent Hein asked Lawal if he knew that the packages contained "China White" heroin, and Lawal responded, "yes." Agents also found evidence that Lawal had been in telephone contact with Obihazar in Bangkok.

Meanwhile, Ms. Murphy was instructed to stay in contact with Obihazar. She called him and told him that she was scared and wanted the first parcel (the one containing 1029 grams of heroin), which she had previously received on November 2nd, out of her residence. On November 7, 1994, Obihazar telephoned from Bangkok with instructions that coconspirator Obasi would pick up this parcel.

At about 3:30 a.m. on November 7, 1994, Obasi, defendant Jinadu, and Jinadu's girlfriend, Ginger Sanders, arrived in Cincinnati from Chicago in an automobile rented by Jinadu. Obasi called Ms. Murphy and told her that he was at a motel in Cincinnati on Central Parkway and gave her the room number. Customs agents attempted to make a controlled delivery of the package, but at first they went to the wrong hotel. By the time Ms. Murphy arrived at the right hotel where Obasi, Jinadu and Sanders were located, it was after 9 a.m. and they were in the process of checking out. Obasi and Jinadu were immediately arrested, and Ms. Sanders was detained, questioned, and then released. Jinadu had in his possession a cellular phone which had been used en route to Cincinnati to call Obihazar in Bangkok. Jinadu was identified at trial as the person who had leased the phone.

At the time of Jinadu's arrest, his girlfriend, Ginger Sanders, told the agents that she lived at 633 North Sheridan, Apt. 202 in Chicago, Illinois. Agents obtained and executed a search warrant at this residence, which had the name "Sanders" on the mailbox. Agents found suitcases that were cut open with the linings pulled out, along with glue, saws, and other equipment used for altering suitcases.

A trial by jury commenced on February 27, 1995, and ended on March 24, 1995. La-

wal was found guilty on all counts of the indictment with which he had been charged: Count One—conspiracy to import heroin; Count Two—conspiracy to possess with intent to distribute heroin; and Count Three—attempt to import one kilogram of heroin on or about October 27, 1994. Jinadu was found guilty on Counts One and Two and acquitted on Counts Three, Four and Five. Codefendant Obasi was acquitted, and coconspirator Obihazar remains a fugitive from justice. Jinadu was sentenced on July 28, 1995 to 121 months in prison on each count to run concurrently. Lawal was sentenced on August 18, 1995 to 120 months on each count to run concurrently. Both defendants filed timely notices of appeal.

*Moruf Lawal*

### II.

Defendant Lawal argues that the testimony of Agent Sullivan about his alleged confession to Agent Hein was hearsay and was erroneously admitted at trial. Agent Sullivan was one of the agents present after Lawal was arrested after the controlled delivery of heroin on November 5, 1994. Agent Sullivan questioned defendant initially. After Agent Hein arrived, he interviewed Lawal. Agent Sullivan remained in the room and listened to the interview. Agent Hein died shortly thereafter. Although he took notes during the interview, the United States was not able to find them. Agent Sullivan testified at trial about the statements of Hein in the questioning of Lawal and Lawal's responses, which he had overheard on November 5, 1994.

In particular, defendant Lawal objects to the following colloquy which took place at trial between the prosecution and Agent Sullivan, who testified as follows:

Q. And do you recall anything that Mr. Lawal was asked concerning the package itself, the content of the package?

A. Yes sir. Agent Hein asked Mr. Lawal if—something to the effect if he knew how much the package weighed, and Mr. Lawal—

MR. PEREZ: Objection, Your Honor. This is hearsay.

THE COURT: He may answer. Proceed.

A. I heard Mr. Lawal answer Agent Hein that he did not know the weight of the package. I think Agent Hein at this time mentioned an amount somewhere over two—

THE COURT: I'll sustain the objection at this point.

MR. BRICHLER: Okay.

Q. Now, did you hear any conversation concerning what was actually in the package?

A. Yes sir. I heard Agent Hein ask—

MR. PEREZ: Same objection.

THE COURT: He may answer.

A. He said something to the effect, you know what's in the package, don't you. And I observed Mr. Lawal nod his head in a manner indicating yes. Immediately following this indication, Agent Hein stated, you know that's China White heroin, to which Mr. Lawal replied, "yes."

Joint Appendix 294–95.

■ The United States argues that the statements of Agent Hein, about which Agent Sullivan testified, are not hearsay because defendant Lawal adopted the statements of Agent Hein as his own. As an adoptive admission, the statement about China White heroin became Lawal's words, and as such, was admissible under Fed.R.Evid. § 801(d)(2)(B).[1]

■ We review a district court's ruling to admit evidence over a hearsay objection *de novo*. *United States v. Fountain*, 2 F.3d 656, 668 (6th Cir.), *cert. denied*, 510 U.S. 1014, 114 S.Ct. 608, 126 L.Ed.2d 573 (1993). Fed.R.Evid. 801(d)(2)(B) permits a court to allow into evidence a statement as non-hearsay if "[t]he statement is offered against a party and is ... a statement of which the party has manifested an adoption or belief in its truth." Adoption can be manifested by any appropriate means, such as language,

conduct, or silence. *Marshall v. Young*, 833 F.2d 709, 716 (7th Cir.1987). If the statements are viewed as the defendant's own, they constitute admissions properly characterized as non-hearsay under Fed.R.Evid. 801(d)(2). *United States v. Nazemian*, 948 F.2d 522, 526 (9th Cir.1991), *cert. denied*, 506 U.S. 835, 113 S.Ct. 107, 121 L.Ed.2d 65 (1992).

■ When a statement is offered as an adoptive admission, the primary inquiry is whether the statement was such that, under the circumstances, an innocent defendant would normally be induced to respond, and whether there are sufficient foundational facts from which the jury could infer that the defendant heard, understood, and acquiesced in the statement. *United States v. Jenkins*, 779 F.2d 606, 612 (11th Cir.1986); *United States v. Sears*, 663 F.2d 896, 904 (9th Cir. 1981), *cert. denied*, 455 U.S. 1027, 102 S.Ct. 1731, 72 L.Ed.2d 148 (1982). The first criterion, which is of particular relevance in cases involving silent acquiescence, is not at issue here because defendant Lawal is alleged to have responded to Hein's questions by answering, "yes." *See United States v. Handy*, 668 F.2d 407, 408 (8th Cir.1982) (defendant's affirmative statement made in response to coconspirator's statement admissible as an adoptive admission).

In regard to the second criterion, we believe that in the present case, there were sufficient foundational facts for the jury reasonably to conclude that defendant did actually hear, understand, and accede to the statements of Agent Hein at issue. *United States v. Gil*, 58 F.3d 1414, 1419 (9th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 430, 133 L.Ed.2d 345 (1995). Both Agents Sullivan and another agent present, Agent Sheard, and numerous other witnesses at trial testified that Lawal exhibited an understanding of English. Agent Sullivan stated that initially he questioned Lawal about his identity and that when Agent Hein arrived, Hein conducted a more specific interview. Sullivan testified that he was in the room

---

1. Fed R. Evid. 801(d)(2)(B) states:
 (d) **Statements which are not hearsay.** A statement is not hearsay if—
 . . . .

(2) **Admission by party-opponent.** The statement is offered against a party and is ... (B) a statement of which the party has manifested an adoption or belief in its truth.

throughout the interview, either sitting on a corner of the bed very close to Lawal and right next to Agent Hein or standing by the door. Sheard also testified that Agent Sullivan was sitting right next to Agent Hein and Lawal during the interview. Lawal was receiving telephone calls from Obihazar, a co-conspirator, while he was being interviewed.[2] Agent Sheard corroborated Sullivan's testimony that initially "Lawal would not acknowledge what was in the parcel, but at some point he did acknowledge it." The evidence, thus, indicates that there is sufficient indicia of reliability that Hein's statements were made in defendant's presence, that defendant understood the statements, and that he had an opportunity to deny them, but instead answered, "yes," indicating his acquiescence in the truth of the questions he was being asked. Based on these facts, in regard to the admissibility of Hein's statements, we hold that they are not hearsay because defendant's adoption of them makes them admissions against interest. *See United ed States v. Rollins,* 862 F.2d 1282 (7th Cir. 1988) (police informant's side of telephone conversations with defendant, during which cocaine transaction were arranged, were admissible in defendant's trial for distribution of cocaine as "adoptive admissions," as defendant frequently agreed with informant and participated in give and take of conversations), *cert. denied,* 490 U.S. 1074, 109 S.Ct. 2084, 104 L.Ed.2d 648 (1989); *Berrisford v. Wood,* 826 F.2d 747, 751 (8th Cir.1987), *cert. denied,* 484 U.S. 1016, 108 S.Ct. 722, 98 L.Ed.2d 671 (1988) (because adoptive admissions were corroborated by other evidence, there was adequate indicia of reliability for admission).

 As this court found in *Poole v. Perini,* 659 F.2d 730 (6th Cir.1981), *cert. denied,* 455 U.S. 910, 102 S.Ct. 1259, 71 L.Ed.2d 450 (1982), adoptive admissions do not violate the confrontation clause. This court stated:

> The District Court found a special indicium of reliability because the out-of-court statements were adopted by the appellant. An adoptive confession avoids the confronta-

tion problem because the words of the hearsay become the words of the defendant. If the defendant accepts the out-of-court statement as his own, cross-examination of the declarant of the hearsay becomes unnecessary and irrelevant. The out-of-court statement is no more damaging than the defendant's own. Though not a common issue in the courts, this Court and others have held admissions of adoptive confessions to be proper and rejected challenges based upon the confrontation clause, although the voluntariness of the ratification may still be questioned.

*Id.* at 733; *see also Berrisford v. Wood,* 826 F.2d at 751 (admission of testimony regarding conversation between defendant and accomplice did not violate defendant's Sixth Amendment right to fair trial; the principles of the confrontation clause should not nullify the well-established exception to the hearsay rule for adoptive admissions); *United States v. Lemonakis,* 485 F.2d 941, 949 (D.C.Cir. 1973) (where a party manifests an intent to adopt another person's statements as his or her own, the need to cross-examine the absent informant under oath is not present, and the confrontation clause is not violated), *cert. denied,* 415 U.S. 989, 94 S.Ct. 1586, 1587, 39 L.Ed.2d 885 (1974).

 In the present case, as in *Poole,* defendant Lawal heard the questions he was being asked by Agent Hein, responded affirmatively, and adopted the contents of Agent Hein's question, "You knew it was China White heroin?" by replying, "yes." In a similar manner, Lawal's answers to Agent Hein's other questions were adoptive admissions. During his confession, Lawal admitted to previous trips to Cincinnati to pick up packages, to registering under a false name, and to his knowledge of Obihazar in Bangkok. Because Lawal adopted the out-of-court statements of Agent Hein as his own, cross-examination of the declarant, Agent Hein, who was unavailable, is unnecessary. As this court in *Poole* pointed out, the out-of-court statements were not more damaging than the defendant's own. 659 F.2d at 733.

---

**2.** The agents' only tape recorder was being used to record the telephone conversations between Obihazar and Lawal.

▇▇▇ Defendant claims that subsequent to the Supreme Court's opinion in *Williamson v. United States,* 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994), *Poole v. Perini* is no longer good law. We do not agree. In *Williamson,* the Supreme Court held that a different Rule of Evidence, Fed.R.Evid. 804(b)(3)[3], does not allow the admission of self-exculpatory statements, incriminating others, even if they are made within a broader narrative that is generally self-inculpatory. *Id.* at ——, 114 S.Ct. at 2435; *United States v. Nagib,* 56 F.3d 798, 804 (7th Cir.1995). In the present case, there are no self-exculpatory statements at issue. As the court in *Williamson* pointed out:

> The question under Rule 804(b)(3) is always whether the statement was sufficiently against the declarant's penal interest "that a reasonable person in the declarant's position would not have made the statement unless believing it to be true," and this question can only be answered in light of all the surrounding circumstances.

512 U.S. at ——, 114 S.Ct. at 2437. In *United States v. Canan,* 48 F.3d 954, 959–60 (6th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 716, 133 L.Ed.2d 670 (1996), this court noted that after *Williamson,* each portion of the proffered out-of-court statement must be examined to determine whether it tended to subject the declarant to criminal liability before it can be admitted under Fed. R.Evid. 804(b)(3). A statement may satisfy this requirement if it would be probative at trial against the declarant. *United States v. Garcia,* 897 F.2d 1413, 1420 (7th Cir.1990). In the present case, we believe that all of defendant's adopted admissions, about which Agent Sullivan testified, were against Lawal's penal interest. In *Williamson,* the Supreme Court pointed out that the defendant's out-of-court statement that he knew there was cocaine in the suitcase would clearly have been admissible under Rule 804(b)(3), because it was a statement which tended to subject the declarant to criminal liability. 512 U.S. at ——, 114 S.Ct. at 2437. Similarly, in the present case, Lawal's adoption of Agent Hein's statement, indicating he knew the packages contained China White heroin, would have been admissible under Rule 804(b)(3) as a statement against interest if Lawal had made the statement himself, rather than adopting Agent Hein's statement by responding, "yes." Similarly, Lawal's admissions about his previous trips to Cincinnati to pick up packages and give money to the same person who had just handed him a package, which he believed contained heroin, his registration under a false name, and his admission to knowing Obihazar, a coconspirator, were all admissions that tended to subject Lawal to criminal liability, because a reasonable person in Lawal's position would not have responded in the affirmative unless he believed the statements to be true. They were therefore admissible as adoptive admissions. *Id.*

*Williamson* holds that portions of a confession that do not inculpate the declarant are not reliable enough for prosecutors to use against anyone other than the declarant. *Carson v. Peters,* 42 F.3d 384, 386 (7th Cir. 1994). In the present case, the admissions of defendant Lawal are not being used against anyone other than Lawal, who adopted the statements of declarant Agent Hein. We, therefore, find that *Williamson* poses no obstacle to our reliance on *Poole v. Perini,* because we believe the holding of *Poole* in regard to adoptive admissions remains good law.[4]

To conclude, questions asked the defendant during an interview are not hearsay

---

**3.** Fed.R.Evid. 804(b)(3) states:

(b) **Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . .

(3) **Statement against interest.** A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

**4.** We make no determination of whether other aspects of *Poole* survive *Williamson.*

when the defendant adopts the information in a question as true. These statements are adoptive admissions, which are admissible pursuant to Fed.R.Evid. 801(d)(2)(B). Therefore, the district court is affirmed on this issue.

### III.

▮ Defendant Lawal next contends that the district court erred in refusing to give Lawal's requested jury instruction regarding Agent Hein's missing notes. Defendant Lawal requested that the district court give the "absent witness" instruction, because the deceased Agent Hein's notes were not produced by the government at trial. However, agents of the government testified that although they had mounted an extensive search for Agent Hein's notes after his death, they were not able to locate them. The district court refused to give the "absent witness" instruction in these circumstances.

▮ We review the district court's decision under an abuse of discretion standard. *Anchor v. O'Toole,* 94 F.3d 1014 (6th Cir. 1996). The "absent witness" jury instruction is to be given in a case where the government fails to produce evidence, and the instruction tells the jury that the failure to produce this evidence creates a presumption that the evidence would be favorable to the defendant. *See Graves v. United States,* 150 U.S. 118, 120–21, 14 S.Ct. 40, 41, 37 L.Ed. 1021 (1893). In other words, if a party that controls evidence fails to produce it at trial, the instruction permits the opposing party an inference that the evidence would be favorable to it. *Id.*

We agree with the district court that this instruction was not warranted. There is no evidence to contradict the government's statement that it had conducted a thorough search, but to no avail. There was, thus, no evidence that the government had Agent Hein's notes, if, indeed, they still existed. Moreover, the instruction applies to witnesses, not to documents. Since the requested jury instruction was not a correct one in the circumstances of the present case, the trial court properly declined to give the absent witness instruction. *See United States*

*v. Sassak,* 881 F.2d 276, 279 (6th Cir.1989). The district court is affirmed on this issue.

### IV.

▮ Defendant Lawal's final argument is that the district court erred in determining that it was bound to sentence him to a statutory minimum mandatory ten-year-to-life sentence pursuant to 21 U.S.C. § 960(b)(1)(A), because the indictment stated he had attempted to import in excess of one kilogram of cocaine on October 27, 1994, and pursuant to 21 U.S.C. § 841(b)(1)(A)(i) because the indictment stated that two kilograms of heroin were involved in the conspiracy.

▮ We agree. The district court erred in determining that the amount of drugs charged in the indictment controlled in regard to the imposition of a mandatory minimum sentence under these statutes. It is well settled law that the determination of the quantity of drugs involved is not an element of the offense charged. *See United States v. Sims,* 975 F.2d 1225, 1243 (6th Cir.1992), *cert. denied,* 507 U.S. 932, 113 S.Ct. 1315, 122 L.Ed.2d 702 (1993); *United States v. Rigsby,* 943 F.2d 631, 639–44 (6th Cir.1991), *cert. denied,* 503 U.S. 908, 112 S.Ct. 1269, 117 L.Ed.2d 496 (1992). As this court stated in *United States v. Moreno,* 899 F.2d 465 (6th Cir.1990), in regard to 21 U.S.C. § 841, section (a) describes the substantive offense, and section (b), imposing mandatory minimum sentences based on the quantity of drugs involved, is a penalty provision only and does not constitute an element of the offense to be determined by the jury. This court stated:

> [I]n *United States v. Wood,* 834 F.2d 1382 (8th Cir.1987), the Eighth Circuit concluded that section 841(b) is a penalty provision and that it does not state distinct offenses.... The court ended its analysis with the conclusion that section 841(b) was nothing more than a sentence enhancement provision, which means that it was unnecessary for a jury to make a special determination as to quantity.
>
> The leading case from the Third Circuit ... *United States v. Gibbs,* 813 F.2d 596 (3d Cir.), *cert. denied,* 484 U.S. 822, 108

S.Ct. 83, 98 L.Ed.2d 45 (1987), [ ] held that section 841(b) was a penalty provision, and that the only requirement was that the indictment put the defendant on notice of the amount of drugs being charged and that the charge may give rise to an enhanced penalty. The amount of marijuana involved was only relevant to the sentence imposed, and did not constitute an element of the offense....

We agree with the Eighth and the Third Circuits that section 841(b) sets forth penalty provisions only.... As such, the sentencing judge, not the jury, has the prerogative to make a determination of the quantity of drugs involved in the scheme and to sentence accordingly....

The district court committed error ... by considering itself bound at sentencing by the jury's findings [in regard to quantity]. *Id.* at 472–73. *See also United States v. Hodges,* 935 F.2d 766, 770 (6th Cir.) (although the amount of the controlled substance is relevant to the punishment that may be imposed, it is not an element of the offense and is properly left to the court for consideration at the time of sentencing), *cert. denied,* 502 U.S. 889, 112 S.Ct. 251, 116 L.Ed.2d 206 (1991); *United States v. McNeese,* 901 F.2d 585, 600–01 (7th Cir.1990) ("The quantity of the controlled substance is not an essential element of the crimes proscribed under section 841(a)(1) and 846; rather, it is a sentencing issue to be raised after proof of a defendant's underlying guilt."). As this court stated in *Hodges,* "It is clear that the great weight of authority (if not all cases) holds that the quantity of the drug involved in an illegal transaction is only relevant to the sentence that will be imposed and is not part of the offense." 935 F.2d at 769. Thus, case law makes clear that the mandatory minimum sentences prescribed in statutes such as 21 U.S.C. § 841 and § 960 are not substantive offenses in themselves, because the quantity of drugs specified in the penalty provisions are not an element of the substantive offense with which the defendant is charged. *United States v. Silvers,* 84 F.3d 1317, 1320 (10th Cir.1996). Because drug quantity is not an element of the substantive offense charged, the government in the present case was not bound at trial to prove beyond a reasonable doubt the specific quantity of drugs charged in the indictment. *Id.; United States v. Cox,* 934 F.2d 1114, 1121 (10th Cir.1991). As the court in *United States v. Reyes,* 40 F.3d 1148, 1151 (10th Cir.1994) held, it is unnecessary for the government to allege drug quantity in an indictment, and even when the government does so, the quantity alleged "does not dictate the mandatory minimum that the court is required to impose."

Thus, in the present case, defendant's conviction under 21 U.S.C. § 841(a) does not mandate a mandatory ten-year-to-life sentence simply based on the amount of heroin charged in the indictment. As the court in *Reyes* stated in regard to 21 U.S.C. § 841:

[W]e made a clear distinction between 21 U.S.C. § 841(a), which simply defines the prohibited conduct for which the defendant was charged, and 21 U.S.C. § 841(b), which defines the penalty to be imposed at the sentencing phase. We held that the drug quantity which invokes the various statutory minimums in section 841(b) "is not an element of the substantive offense upon which the charge is based," but rather is "a sentencing provision independent of the substantive charges to which it applies." Thus, because the quantities in section 841(b) are "applicable only to sentencing," any quantity term in an information or indictment, ... does not dictate the mandatory minimum that the court is required to impose.

40 F.3d at 1151 (citations omitted).

■ The same distinction between the substantive offense and the penalty provision applies to the other statute at issue in the present case—21 U.S.C. § 960. Section 960(a) is the substantive offense, stating that the importation of a controlled substance is an unlawful act; section 960(b) is the penalty provision, explaining the mandatory minimum sentences that must be imposed based on drug quantity. As the court in *United States v. Harris,* 39 F.3d 1262, 1271 (4th Cir.1994) explained, "a district court [at sentencing] must first determine the 'quantity of narcotics ... prior to a determination of the applicability of the mandatory minimum sen-

tence provisions ....'" (citation omitted). *See also United States v. Harrison–Philpot,* 978 F.2d 1520, 1523 (9th Cir.1992), *cert. denied,* 508 U.S. 929, 113 S.Ct. 2392, 124 L.Ed.2d 294 (1993) (the quantity of drugs involved in a violation establishes the applicable statutory minimum; district courts determine the quantity of drugs involved in a violation at sentencing).

█ In the present case, the district court failed to make a determination of the quantity of drugs involved at sentencing; it believed instead that it was bound to impose a statutory mandatory minimum sentence of ten years because defendant Lawal had been charged in the indictment with conspiring to import and distribute and with attempting to import in excess of one kilogram of heroin. Because the court below erroneously believed it was bound by the indictment, the court made no findings at sentencing in regard to the quantity of drugs attributable to defendant Lawal. As Lawal's attorney pointed out, the pre-sentence report attributed to Lawal only 318 grams of heroin, which was the amount that had been in the package he took from Ms. Murphy at the controlled delivery on November 5, 1994. The district court failed to make any findings whether additional amounts of heroin could be attributed to Lawal pursuant to U.S.S.G. § 1B1.3 or if greater amounts than the 318 grams in the package Lawal received were involved in the conspiracy and were reasonably foreseeable to Lawal. Before a mandatory minimum sentence based on a specific quantity of drugs can be imposed, such findings must be made. 39 F.3d at 1271. In *United States v. Castaneda,* 94 F.3d 592, 595 (9th Cir.1996), the court of appeals held that the district court erred in believing it had to impose a five-year statutory minimum sentence pursuant to 21 U.S.C. § 841(b)(1)(B)(ii) solely because the indictment had charged the defendant with importing over 500 grams of cocaine. The court in *Castaneda* remanded the case for resentencing based on the quantity of drugs actually attributable to the defendant. *Id.* at 596. In the present case, the district court made a similar error and, therefore, a remand is necessary.

To conclude, the district court failed at sentencing to determine the amount of heroin attributable to Lawal and instead erroneously relied on the amount of drugs charged in the indictment in its imposition of a statutory mandatory minimum ten-year sentence. Contrary to the district court's belief, the indictment does not control. In the present case, the government was not required to prove a specific quantity of drugs before the jury, but only had to prove some amount in order to gain convictions under 21 U.S.C. 841(a) and 21 U.S.C. § 960(a). *See United States v. Barnes,* 890 F.2d 545, 551 n. 6 (1st Cir.1989), *cert. denied,* 494 U.S. 1019, 110 S.Ct. 1326, 108 L.Ed.2d 501 (1990). Rather, the government was required to establish at sentencing the quantity of drugs attributable to defendant Lawal by a preponderance of the evidence in order for the district court to determine whether the mandatory minimum sentence provisions of § 841(b) and 21 U.S.C. § 960(b)(1)(A) were triggered. *See United States v. Gonzales,* 929 F.2d 213, 216 (6th Cir.1991); *United States v. Underwood,* 982 F.2d 426, 429 (10th Cir.1992), *cert. denied,* 509 U.S. 925, 113 S.Ct. 3043, 125 L.Ed.2d 729 (1993). Because the district court made no findings in this regard, defendant Lawal's sentence must be vacated, and the case must be remanded to the district court for resentencing.

### *Olayemi Jinadu*

### V.

█ Defendant Jinadu contends that the district court erred in denying his motion for a mistrial because the altered suitcases found in the apartment of Tayo Sanders were improperly placed in front of the jury for three hours at the beginning of trial and inflamed and impassioned the jury. Defendant contends that when Ginger Sanders, Jinadu's girlfriend, was detained on November 7, 1994, she gave her address as 633 North Sheridan, Chicago, Illinois. United States Custom agents went to that address, which had "Sanders" on the mailbox, and executed a search warrant there. Agents found suitcases that had been cut up with the linings removed, and glue, saws, and other paraphernalia, obviously used for smuggling.

Defendant argues that Ginger Sanders gave a false address to the police, because at the time she was no longer living at that address, which was her husband's, Tayo Sander's, residence, but instead was living with Jinadu at his apartment. Defendant argues that although the government did not try in any way to link the altered suitcases found in Tayo Sander's apartment to any of the defendants, the suitcases, which obviously were used for smuggling, were erroneously brought into the courtroom at the beginning of the trial and displayed before the jury for over three hours. Defendant argues that the failure of the court to give a curative instruction was an abuse of discretion and denied him a fair trial.

We cannot address the impropriety of such an action because defendant Jinadu's attorney rejected the district court's offer of a curative instruction to admonish the jury to disregard the suitcases. The attorney stated:

> MR. YAROS: I'll withdraw the request for the instruction if I'm allowed to argue it [before the jury] should I desire.

Mr. Yaros was defendant Jinadu's attorney and clearly and unequivocally waived defendant's right to a curative instruction. The transcript from the trial indicates that the district court was prepared to give an instruction to the jury to ignore the suitcases, which had erroneously been placed before the jury at the beginning of trial. However, after a discussion among the defense attorneys, Jinadu's counsel decided to withdraw his request for a curative instruction because he wanted to argue the point to the jury in closing arguments. The district court, having offered to provide a curative instruction, cannot now be faulted, because Jinadu's defense counsel withdrew his request for the instruction. *United States v. Feroni,* 655 F.2d 707, 712 (6th Cir.1981) (the trial court's obligation to instruct the jury ended when the court offered to give the cautionary instruction and defense counsel declined). Defendant's attorney explicitly waived defendant's right to a curative instruction, and, therefore, cannot attempt to revisit this issue on appeal. The district court is affirmed on this issue.

## VI.

Finally, we must consider whether the district court correctly determined the weight of the heroin in sentencing defendant Jinadu.

Defendant Jinadu asks this court to accept a purity versus scale weight based on the total weight of heroin in order to allow for a downward departure from his sentencing guideline range. Defendant Jinadu realizes that according to case law and by statute, if a mixture of a compound contains a detectable amount of a controlled substance, the entire amount of the mixture or compound shall be considered in measuring the quantity. The Anti–Drug Abuse Act, 21 U.S.C. §§ 846, 841(b)(1)(A). As we held in *United States v. Williams,* 894 F.2d 208, 215 (6th Cir.1990), the provision of United States Sentencing Guideline § 2D1.1 in this regard is consistent with the Anti–Drug Abuse Act. Defendant Jinadu, in effect, is asking this court to overrule our decision in *Williams,* which this panel is not at liberty to do. Therefore, defendant's argument that purity instead of scale weight should be the standard has no merit. The district court is affirmed on this issue.

## VII.

To conclude, the district court is affirmed in part and reversed in part. In regard to defendant Lawal, his conviction is **AFFIRMED**. However, his sentence to a statutory mandatory ten-year imprisonment based on the amount of drugs charged in the indictment is **REVERSED**, and the case is **REMANDED** for resentencing in proceedings consistent with this opinion.

In regard to defendant Jinadu, his conviction and sentence are hereby **AFFIRMED**.