**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Antonio BLAIR, Defendant–Appellant.**

**No. 02–3345.**

United States Court of Appeals,
Sixth Circuit.

July 22, 2003.

Before KEITH, SUHRHEINRICH, and CLAY Circuit Judges.

KEITH, Circuit Judge.

Defendant–Appellant, Antonio Blair ("Blair"), appeals the judgment of sentence entered following his guilty plea conviction for conspiring to distribute marijuana, cocaine, and cocaine base.

For the reasons set forth below, we conclude that the district court did not commit clear error when it found that Blair was responsible for three nine-ounce transactions of cocaine base once the court determined the quantity of drugs for which he was responsible, and AFFIRM the judgment of the district court.

## I. BACKGROUND AND FACTUAL SUMMARY

*Background*

On July 12, 2000, a federal grand jury sitting in Cincinnati returned an indictment charging Blair with: (1) conspiring with others to distribute cocaine, cocaine base, and marijuana between 1989 and 2000, in violation of 21 U.S.C. § 846 and 21 U.S.C. § 841(a)(1); and (2) nine counts of using a telephone to facilitate the commission of a drug felony, in violation of 21 U.S.C. § 843(b). Blair negotiated a plea agreement with the Government and entered a plea of guilty on October 31, 2000. The plea agreement stated that the Government would recommend that Blair's base offense level for sentencing purposes would be level thirtyeight–which corresponded with Blair's possession/attempt to distribute an amount of cocaine base in excess of 1.5 kilograms. Blair acknowledged that he had possessed this amount during his change of plea hearing.

After several continuances, Blair's sentencing was set for October 10, 2001. Prior to sentencing, the Government filed a motion for downward departure pursuant to U.S.S.G. § 5K1.1, recommending that in light of his substantial assistance to authorities, Blair should be sentenced within the guideline range established by level thirty-one of the United States Sentencing Guidelines ("Guidelines"), rather than the level thirty-five range recommended by the Probation Department in the Presentence Report (PSR). Prior to sentencing, Blair filed objections to the PSR findings as to the base offense level and the firearm enhancement of two points. At sentencing, the district court overruled Blair's objections and adopted the findings of the PSR. The district court granted the Government's motion for downward departure, and proceeded to sentence Blair within the level thirty-one range. Accordingly, Blair received a sentence of 188 months of imprisonment, along with three years of supervised release, a special assessment of $100, and a fine of $1000.

Blair was advised of his right to appeal, and the district court directed the clerk to file a notice of appeal on his behalf. Unfortunately, the district court clerk neglected to file Blair's notice of appeal. Upon discovering this oversight, the district court ordered the clerk to file a notice of appeal *nunc pro tunc* as of the date of Blair's judgment and commitment order. A timely notice of appeal was then filed in the district court on March 26, 2002.

*Factual Summary*

Between the dates of March 19, 1998 and May 17, 1998, a court-ordered wiretap surveillance was conducted by the FBI on

several telephones known to be utilized by Blair. One such telephone was monitored at the apartment of Blair's sister, Cozetta Ballard ("Ballard"), located on Gobel Avenue in Cincinnati, Ohio. During the course of the surveillance, the FBI intercepted numerous drug-themed conversations between Blair and several co-conspirators– John Alvin West ("West"). Germelle Dewberry ("Dewberry"), Samuel Carter ("Carter"), and Michael Steele ("Steele"). At his plea hearing, Blair admitted that he had distributed in excess of 1.5 kilograms of crack cocaine during the conspiracy. On three separate occasions, Blair and his co-conspirators converted nine ounces of cocaine into cocaine base (i.e., crack cocaine). These are the twenty-seven ounces of cocaine referred to in the PSR to which Blair objected prior to sentencing.

According to testimony given during the sentencing hearing and information contained in the PSR, the first nine-ounce transaction occurred on March 24, 1998. FBI agents intercepted a telephone call indicating that Blair and West were in Ballard's apartment "cooking powder cocaine into cocaine base." In another phone call, very early in the morning hours. Blair asked Ballard to "clean up," which was interpreted by the agents as a request for her to dispose of crack production waste materials. (J.A. at 130). After intercepting this call, agents conducted a "trash pull" at the residence and found plastic bags, freezer bags, and paper plates. A laboratory analysis revealed that these items contained trace amounts of cocaine residue. The investigating agents conducted further surveillance and retrieved these items when they observed Ballard dispose of them in the garbage dump the following day. West later admitted that the freezer bag contained at least 250 grams of powder cocaine. Additionally, he stated that he and Blair converted the 250 grams of powder cocaine into nine ounces of cocaine base, and Blair then distributed it.

The second disputed nine-ounce transaction occurred on April 7, 1998. On this day, FBI agents intercepted a telephone conversation which indicated that Blair was once again inside Ballard's apartment converting powder cocaine into cocaine base. In the phone call, agents overheard Blair's brother-in-law, James Ballard ("Mr.Ballard"), state to his wife that Blair had arrived with Carter, and left after putting a pot of water on the stove to boil. Ballard subsequently phoned Mr. Ballard and informed him that Blair and Carter simply needed to purchase a few supplies from the store, and would return shortly. During this conversation, Mr. Ballard indicated that it appeared as though Blair and Carter were preparing to "cook" something. After listening to this conversation, agents again conducted a trash pull at the residence and recovered a paper bag. a box of baking soda, and a freezer bag. The paper bag and the freezer bag both tested positive for cocaine residue during laboratory analysis. West again admitted to supplying Blair with at least 250 grams of cocaine in the freezer bag, which was subsequently converted into at least nine ounces of cocaine base by Blair and Carter.

The final disputed nine-ounce transaction challenged by Blair on appeal is described in paragraph fifty of the PSR. Curiously though, Blair neglected to object to the findings contained in paragraph fifty when he filed his written objections to the content of the PSR on December 13, 2000. According to paragraph fifty of the PSR, on April 12, 1998, a telephone conversation was intercepted by agents which indicated that Blair was in the process of converting powder cocaine into cocaine base–all while in Ballard's apartment located at 3272 Gobel, in Cincinnati. Agents also intercepted

a telephone conversation between West and Blair, wherein West advised Blair that he was coming over to the apartment for the purpose of picking up a quantity of cocaine base. Subsequent to these events, agents conducted a trash pull at the residence on April 14, 1998, and recovered two freezer bags, a Kroger bag, clear wrapping paper, and tape. Each of these items later tested positive for cocaine during laboratory analysis. Later, West admitted that he had supplied Blair with approximately 250 grams of powder cocaine on this occasion, and that the powder was indeed converted into cocaine base. Soon after, Blair proceeded to distribute the cocaine base.

With regard to Blair's objections to certain content within the PSR, the district court stated:

> First, the defendant objects to paragraph 49, asserting that there is not a preponderance of evidence to prove that he engaged in telephone conversations to discuss drug trafficking activities ... [t]he testimony of Special Agent Mark Rogers and the presentence report found that the FBI conducted telephone wire taps on multiple occasions and recorded the defendant discussing drug transactions.
>
> Second, the defendant objects to paragraphs 48 and 49 because he does not believe a preponderance of the evidence proves that he is responsible for the drug quantities listed in those paragraphs ... through the testimony of [Agent] Rogers and the presentence report, the Court finds that an intercepted phone conversation led to the discovery of physical evidence of cocaine and the admission of co-defendant Alvin West that he and defendant Blair had, in fact, made the nine ounces of cocaine base described in paragraph 48 ... [a]nother different intercepted phone call again led to physical evidence of the cocaine and the admission of co-defendant Alvin West that Mr. West supplied [Blair]

> with the cocaine for which he is held responsible in paragraph 49.
>
> Once again, the testimony of [Agent] Rogers, as well as the finding of the presentence report, is that, in addition to these two amounts, the defendant received and then transmitted nine ounces of cocaine base in March of 1998 ... [i]n addition, telephone conversations and the information provided by a cooperating defendant proved that the defendant converted 750 grams of powder cocaine into 27 ounces of cocaine base between March 24, 1998, and April 12, 1998 ... [t]hus, the defendant is responsible for 505.15 grams of powder cocaine and 837.5 grams of cocaine base.

(J.A. at 138–39).

Blair's final argument on appeal is that the district court incorrectly found that a two-point enhancement for possession of a dangerous weapon applied, as was recommended in paragraph fifty-one of the PSR. According to the information detailed in paragraph fifty-one of the PSR, Blair traveled to an apartment on May 9, 1998 in order to confront co-defendants Dewberry and Carter. Blair was under the impression that the pair had misplaced five ounces of cocaine base. (J.A. at 168). Agent Rogers testified during sentencing that several telephones were intercepted on this day regarding this incident. On the day in question, Blair called his sister, Ballard, and notified her that he was about to "kill somebody," and that "something was missing." Later, Blair phoned West and told him he had problems and that something was missing. It was in this phone call that Agent Rogers testified that he clearly heard Dewberry and Carter in the background, and the sounds of "females yelling and screaming." (J.A. at 128–29).

Agent Rogers later interviewed independent witnesses who stated that Blair was

brandishing a firearm during the episode in the apartment. Additionally, several co-defendants testified that Blair was armed during this incident. In reference to this issue, the district court stated the following:

> [T]he defendant objects to paragraphs 51 and 77 arguing that a preponderance of the evidence does not prove that he used a firearm in relation to the instant offense. The rather vivid testimony of [Agent] Rogers this morning, as well a[s] the presentence report, found that federal agents intercepted a phone conversation between [Blair and West], and during this conversation Mr. Blair threatened his co-defendant, Mr. Dewberry, with a firearm. Mr. Dewberry later confirmed that the defendant was using a firearm at the time. In addition to that, the testimony today of [Agent] Rogers indicates that there were other witnesses who would testify to that as well.

(J.A. at 139).

After it had addressed all of Blair's objections, the district court held that Blair's proper offense level for possessing between 500 grams and 1.5 kilograms of cocaine base, was level thirty-six. The district court then enhanced this figure by two levels for possession of a firearm, and reduced the total figure by three levels for Blair's acceptance of responsibility–leaving a total offense level of thirty-five. Finally, the district court granted the Government's § 5K1.1 motion, which reduced Blair's offense level to thirty-one. Blair was subsequently sentenced to 188 months of incarceration. (J.A. at 148). This appeal followed.

## II. STANDARD OF REVIEW

A district court's findings of fact during a sentencing hearing, including findings relating to drug quantity, are reviewed for clear error. *United States v. Hough*, 276 F.3d 884, 891 (6th Cir.2002) (quoting *United States v. Jennings*, 83 F.3d 145, 149 (6th Cir.1996)). The quantity of drugs need only be supported by a preponderance of the evidence. *Id.; see also United States v. Jinadu*, 98 F.3d 239, 249 (6th Cir.1996). The district court may rely on any competent evidence in the record; however, the district court's findings must have "some minimum indicium of reliability beyond mere allegation." *United States v. Ward*, 68 F.3d 146, 149 (6th Cir.1995). In *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 595 (6th Cir.2001), our court held that "[a] district court's factual findings are clearly erroneous if based on the entire record, we are left with the definite and firm conviction that a mistake has been committed."

Our court reviews a district court's factual finding that a defendant possessed a firearm during a drug-trafficking offense for clear error. *Hough*, 276 F.3d at 894; *see also United States v. Saikaly*, 207 F.3d 363, 366 (6th Cir.2000). The commentary to § 2D1.1(b)(1) states that the firearm enhancement "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1, cmt. n. 3. For the two-level § 2D1.1(b)(1) enhancement to apply, the Government must establish that: (1) the defendant actually or constructively possessed the weapon, and (2) such possession was during the commission of the offense. *See Hough*, 276 F.3d at 894; *see also United States v. Sanchez*, 928 F.2d 1450, 1460 (6th Cir. 1991). Constructive possession is established if the defendant had "ownership, or dominion, or control over the [firearm] itself, or dominion over the premises where the [firearm] is located." *Id.* (internal quotation marks omitted). Once the Government establishes possession during an offense, it creates a presumption that the weapon was connected to the offense. The

defendant must then demonstrate that it was "clearly improbable" that the weapon was connected with the crime. *Sanchez*, 928 F.2d at 1460.

## III. ANALYSIS

■ In the case at bar, Blair asserted before the district court that *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), rendered problematic the application of the Guidelines to his case. We find this assertion to be without merit. The district court did not violate the rule promulgated by the Supreme Court in *Apprendi* which, for sentencing purposes, requires that any fact that increases a defendant's sentence beyond the prescribed statutory minimum be submitted to the jury and proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490, 120 S.Ct. 2348. Here, twenty years (240 months) is the maximum sentence for Blair's crime pursuant to 21 U.S.C. § 846. Blair was eventually given a sentence of just over fifteen years (188 months), accordingly, his sentence in this case did not exceed the prescribed statutory maximum. As such, the sentencing requirements of *Apprendi* were not violated by the district court.

■ The district court did not commit clear error when it found that Blair was responsible for three nine-ounce transactions of cocaine base once it determined the quantity of drugs for which he was responsible. As stated above, the Government simply must prove the quantity of drugs attributable to Blair by a preponderance of the evidence. At Blair's plea hearing, he acknowledged, under oath, that he was responsible for distributing in excess of 1.5 kilograms of cocaine base. (J.A. at 92–92, 95–96). Additionally, in arriving at its decision to attribute a total quantity of between 500 grams and 1.5 kilograms of cocaine base to Blair, the district court relied upon the trial testimony of Special

Agent Rogers, which revealed that the FBI conducted telephone wire taps on multiple occasions and recorded Blair openly discussing drug transactions, along with: (1) related information documented in the PSR; (2) the admissions of co-defendant Alvin West–which were corroborated by physical evidence seized by investigating agents. Accordingly, we see no clear error in the findings of the district court regarding drug quantity.

■ With respect to Blair's possession of a firearm, and the resulting two-point enhancement he received under § 2D1.1(b)(1) of the Guidelines, we are inclined to agree with the district court's treatment of this issue. Compelling evidence that Blair possessed a firearm does exist in the record. Agent Rogers testified before the district court that, on the day of the incident, intercepted telephone conversations indicated that Blair threatened at least one of his co-defendants, Dewberry, with a firearm. Dewberry later confirmed that Blair brandished a firearm during the encounter in Ballard's apartment. Further, Agent Rogers testified that Blair had called his sister on the day of the incident. and told her that he was going to "kill somebody" because he believed approximately five ounces of cocaine base had been misplaced by Dewberry and Carter. After consideration of this and related evidence, the district court concluded that Blair did possess a firearm, and that he had threatened Dewberry in relation to his ongoing drug-trafficking. (J.A. at 139).

Indeed, the facts establish Blair's weapon possession by a preponderance of the evidence. However, the commentary of the Guidelines suggest, "[this] adjustment should be applied if the weapon was present ..." U.S.S.G. § 2D1.1, cmt. n. 3. As

stated by Blair in his brief, "[g]enerally, as the commentary suggests, disputes regarding this guideline focus on whether a seized weapon was connected with the drug-trafficking offense; here, however, the question is the more fundamental one of was the weapon present at all?" (Appellant's Br. at 22). Interestingly, the Government did not present any evidence regarding the existence of a firearm, and no actual weapon was ever recovered which could be linked to Blair. Agent Rogers admitted this much on cross-examination. (J.A. at 135). In spite of this, we conclude that Blair constructively possessed a weapon during the commission of the offense for which he was convicted. Credible evidence in the form of witness testimony exists in the record to establish that Blair constructively possessed a weapon, thus creating a presumption that he did possess a firearm. Blair has failed to rebut this presumption by demonstrating that it was "clearly improbable" that the weapon was connected with his crime. As such, the district court's finding regarding this issue did not amount to clear error.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court in all respects.