BENTON, J.,
dissenting.
“As a general rule, hearsay evidence is incompetent and inadmissible.” Neal v. Commonwealth, 15 Va.App. 416, 420, 425 S.E.2d 521, 524 (1992). Furthermore, a codefendant’s out-of-court statement impheating a defendant in a crime is a category of hearsay that is presumptively and inherently unreliable. Lilly v. Virginia, 527 U.S. 116, 131, 119 S.Ct. 1887, 1897, 144 L.Ed.2d 117 (1999). In view of these principles, “[a] party who relies upon an exception to an exclusionary rule of evidence bears the burden of establishing admissibility.” Doe v. Thomas, 227 Va. 466, 472, 318 S.E.2d 382, 386 (1984).
At a pretrial hearing, the trial judge considered Kenneth Parker’s testimony as proffered. Parker testified that Gregory Williams, Lester B. Lynch, and a “younger fellow” arrived at Williams’s brother’s residence in the evening. Williams exited the car and rang the doorbell. After Williams’s brother came downstairs and opened the door, Williams and his brother went upstairs followed by Parker. Lynch was outside the building talking to the “younger fellow.”
Based on Parker’s proffered testimony, the trial judge ruled that statements Williams made to his brother and Parker *357 inside the residence the day the killing occurred were admissible. In pertinent part, Parker’s testimony established the following:
A. When I followed [Williams] upstairs, I went to the den. He went to his brother’s room.
Q. So you weren’t in the hallway then; is that correct?
A. Not at that time. I didn’t go into the hallway until [Williams’s] brother ... came out of the room. And when he came out of the room, I went to the bathroom. When I went to the bathroom, I overheard [Williams] telling [his brother] what had happened.
Q. So this conversation took place in the bedroom?
A. No, it took place in the hallway. His brother came into the hallway because his girlfriend was in the room. She was going into labor.
Q. At this time [Williams] tells his brother what has happened; is that correct?
A. The little young boy downstairs is trigger happy.
Q. My question is he told his brother what had happened?
A. Yeah.
Q. At that point you don’t see Mr. Lynch, do you?
A. No, not at that time. He didn’t come up the stairs
right then. He didn’t come up the stairs until----
He didn’t come up the stairs—like when I got in the conversation like after I overheard [Williams], what he was telling his brother, that’s when I got in the conversation, and that’s when [Lynch] came up the stairs.
Q. In fact, you’ve testified before you don’t know what he heard, do you?
A. What who heard?
Q. [Lynch].
A. I can’t hear for him. You know what I am saying? Only thing I can do is tell you what [Lynch] said. As far as what he heard, them his ears. I can’t tell you exactly what he heard. Only thing I know is [Lynch] asked [Williams] *358 why was he telling [Williams’s brother] what they had just done.
* * * * *
A. Yeah. I mean, I didn’t put the exact point of time, whether he came when [Williams] was talking or whether he came when I was talking. I didn’t say that in my testimony at [Williams’s] trial. I’m telling you [Lynch] came upstairs when we was talking and he asked [Williams] why was he telling us that. At what point what he heard or whether I was talking or whether [Williams] was talking, I don’t know. You know what I am saying? You’re asking me to tell you something that I don’t know.
Q. Did he ever say what that was?
A. What what was?
Q. You said, why are you telling him what we just done? Did he ever say what that was that they had just done? A. No, but [Williams] responded back to him and said, this my brother, and [Parker] is cool. He ain’t going to say nothing. Eventually he was talking about what he was telling us about.
Q. So you assume that, right?
A. Yeah. Well, I am assuming.
The trial judge ruled “that the matter will be an adoptive admission.” Over Lynch’s hearsay objection, Parker later testified at trial as follows:
Q. What starts to happen when you get upstairs?
A. When I got in the den area, [Williams] had went to the bathroom. He came out and knocked on his brother’s door, and he starts talking to his brother. He was telling him about what they had just done. So I was in the den area. I could hear basically what they were saying.
Q. Did you have any problem hearing anything that was being said?
A. No. And I heard [Williams] say that they had just shot a woman. So when I heard the part that they had just shot *359 a woman, that’s what really, really, you know, gripped my attention.
So I came out of the den, and I was like, man, what you done got yourself into? You-all done shot a woman? And [Williams] was like, yeah. So I was like, where was you-all at? He was like, we went to [Ronald Scott’s] house---He said we went to go get [Scott]. And I was like, why would you-all go in and try to do something and rob him or whatever when he cool with everybody? You know, he hang out with us. And [Williams] was like, man, I’m going to get put out. My light’s due, my rent due, my girl getting ready to leave and I don’t care who I get.
So I said, well, who was the lady that you-all shot? So he was like, it was a skinny lady. I said, that man’s mom is, you know, skinny. And he was like, no, it won’t his mom. It probably was his sister. I said, what difference does it make if it was his sister or his mom, you know? And at that time [Lynch] was coming up the stairs.
On cross-examination, Parker repeats that Lynch is outside of the residence when Parker, Williams, and Williams’s brother entered it.
Q. And you get upstairs—
A. Right.
Q.—and there is a conversation that goes on. [Williams] goes into the bathroom. You go into the den. Then [Williams] and his brother engage in a conversation.
A. Correct.
Q. At that time [Williams] tells him that they’ve just killed a woman?
A. Yeah. He said—these words is his exact words. He said, “That young kid downstairs leaning on the car is trigger happy.” And [Williams’s] brother was like, “what you talking about?” And [Williams] like, “Man, he just shot a lady.”
Q. And at that point, the person that you’re describing as Lester Lynch is not in the house, is he?
*360 A. No. He didn’t come up until—
Q. And then at some point while you’re talking to [Williams], the person comes upstairs and says, “Why are you telling him what we just done?”
A. Not the person. Him. The gentleman right there, Mr. Lester Lynch. He came up the stairs and asked him, he said, “Why are you telling them what we just done?”
Q. Did he ever say why you telling them why we went to kill someone?
A. No. He didn’t say nothing about that. He asked him—
Q. Did he ever—
A. [Williams] had already told us that someone had got killed. And [Lynch] walked up and asked him why was he telling us what they had just done.
Q. But you said [Williams] told his brother we had been on a sting, right? Isn’t that what you said?
A. Yes.
Q. And you said—
A. And [Williams] told them what happened.
Q. Didn’t you just say a sting could be anything?
A. Like a sting is slang for robbing or you can go steal something to get away with it. I got away with that sting. You could rob somebody. You could plan to rob somebody and say I’m going on a sting tonight, you know. You don’t know. It could be stealing radios out cars, anything. A sting is going to do something wrong, period.
Q. So he never said it was killing anyone?
A. [Williams] said they had shot someone. He said they just shot—
Q. But that’s what you’re saying that [Williams] said?
A. Yeah. [Williams] said they had just killed somebody.
The Commonwealth, which was the party “ ‘seeking to have hearsay declarations of a witness admitted as an exception to the general rule[,] must clearly show that [the hearsay decía *361 rations] are within the exception.’ ” Id. (citation omitted). I would hold that the Commonwealth failed to meet its burden and that the trial judge erroneously admitted Parker’s recitation of Williams’s statements as “an adoptive admission” by Lynch. When a statement is offered as an adoptive admission, a primary inquiry the trial judge must make is “whether there are sufficient foundational facts from which the jury could infer that the defendant heard, understood, and acquiesced in the statement.” United States v. Jinadu, 98 F.3d 239, 244 (6th Cir.1996). To satisfy this exception to the hearsay rule, the evidence must prove the “statement tending to incriminate one accused of committing a crime is made in his presence and hearing.” James v. Commonwealth, 192 Va. 713, 718, 66 S.E.2d 513, 516 (1951).
Simply put, the Commonwealth’s evidence did not prove the predicate facts necessary to invoke the hearsay exception. See Sapp v. Commonwealth, 263 Va. 415, 424, 559 S.E.2d 645, 650 (2002) (holding that the proponent of evidence, which is claimed to fall within an exception to the hearsay rule, has the burden “to lay a proper predicate for its introduction”); United States v. Robinson, 275 F.3d 371, 383 (4th Cir.2001) (noting that under the federal rules a primary determination is “whether there are sufficient foundational facts from which the jury could infer that the defendant heard, understood, and acquiesced in the statement”). Both case law and commonsense dictate that for a defendant to have adopted an admission as his own “foundational facts” must first establish that the defendant heard and understood the statement.
No evidence proved Williams made his statement in Lynch’s “presence and hearing.” James, 192 Va. at 718, 66 S.E.2d at 516. Indeed, the evidence established just the opposite: that Lynch was not in the presence of the three men when Williams spoke about the killing. Parker testified he was in the bathroom when Williams first mentioned the killing to his brother. By Parker’s own testimony, he joined the conversation only after he emerged from the bathroom in the den, and he was aware Lynch had not then entered the residence: “[h]e [Lynch] didn’t come up the stairs.” Obviously, Lynch could *362 not have adopted the statement as his own if he never heard it. It is simply speculation to say at what point, if at all, Lynch adopted any of Williams’s comments. Yet, the jury was allowed to attribute to Lynch all of Williams’s statements. In view of the evidence, it is just as likely that Lynch was motivated to speak merely because he detected a heated argument as he ascended the stairs. For these reasons, I would hold that the evidence failed to prove that Lynch heard Williams’s conversation and that, therefore, the trial judge erred in admitting into evidence Williams’s statements about the killing.
I would further hold that the admission of the hearsay evidence was not harmless. This inadmissible evidence was so prejudicial to Lynch that we cannot reasonably conclude that it did not affect the verdict.
“[I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected____If so, or if one is left in grave doubt, the conviction cannot stand.”
Clay v. Commonwealth, 262 Va. 253, 260, 546 S.E.2d 728, 732 (2001) (quoting Kotteakos v. United States, 328 U.S. 750, 764-65, 66 S.Ct. 1239, 1247-48, 90 L.Ed. 1557 (1946)). Applying this test, the United States Supreme Court has held that “the principle of Kotteakos [means] that when an error’s natural effect is to prejudice substantial rights and the court is in grave doubt about the harmlessness of that error, the error must be treated as if it had a ‘substantial and injurious effect’ on the verdict.” O’Neal v. McAninch, 513 U.S. 432, 444, 115 S.Ct. 992, 998, 130 L.Ed.2d 947 (1995). “The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.” Kotteakos, 328 U.S. at 765, 66 S.Ct. at 1247-48. Consistent with these principles, the Supreme Court of Virginia has held that even if “the other evidence amply supports the ... *363 verdicts, [error is not harmless when] the disputed [evidence] may well have affected the ... decision.” Cartera v. Commonwealth, 219 Va. 516, 519, 248 S.E.2d 784, 786 (1978). In short, our “harmless error analysis ... [is not] simply a sufficiency of the evidence analysis.” Hooker v. Commonwealth, 14 Va.App. 454, 458, 418 S.E.2d 343, 345 (1992).
The inadmissible evidence had such a substantial influence that we cannot reasonably conclude that it did not affect the verdict. The jury was asked to make a critical credibility determination whether to believe Lynch’s alibi witnesses, who placed him somewhere else during the killing, or to believe Scott, Reid, and Parker, whose testimony placed Lynch at the house where the woman was killed. The inadmissible hearsay evidence served to impermissibly buttress the credibility of the Commonwealth’s witnesses because the evidence identifying Lynch as being present at the killings was problematic and was marred by a number of inconsistencies.
For example, Reid, who was present in the house when the killing occurred, testified that the man who entered the room with Williams wore a mask. After the killing, she could not identify Lynch from photographs. She only later identified him when she saw him in court as the defendant. Scott, on the other hand, was in the same room as Reid but testified that the man did not wear a mask. He did not initially identify the man as Lynch but did so at trial.
Significantly, the record indicates that shortly after the killing, Scott identified Parker, not Lynch as one of the persons who entered the residence when his mother was killed. He admitted at trial that he first told police that Williams, Williams’s brother, and Parker may have been the ones who robbed him. This identification was significant because Scott and Parker knew each other quite well. Scott also knew Williams. The jury may not have believed this curious change in Scott’s memory and identification had they not learned about Lynch’s “adopted” confession that Parker related at trial.
*364 Scott also testified that Parker twice had visited him at his mother’s house earlier that day. The first time, Parker purchased heroin. He later returned to the house and demanded a return of his money, accusing Scott of selling bad heroin. Scott testified that during both occasions Williams, whom he knew, and Lynch, whom he had not previously met, were in a car waiting for Parker. Conversely, in his testimony, Parker never acknowledged his earlier presence at Scott’s mother’s house or that he knew Scott had a large amount of money and heroin in the house.
•Significantly too, Parker’s testimony conflicted with Scott’s testimony about Lynch’s whereabouts during the day. Whereas Scott testified that Lynch was waiting for Parker in the car when Parker purchased heroin, Parker testified that he first saw Lynch with Williams in the early evening and that he accompanied them in the car for just one block because Lynch and Williams had someplace else to go. Parker testified that he next saw Williams and Lynch when they returned to Williams’s brother’s residence with a “younger fellow” whom he did not identify. At that time, Williams went upstairs and made his statement about the shooting.
The Commonwealth’s use of Parker’s testimony to tie Lynch to Williams’s statement effectively shifted the focus from Scott’s earlier statement to the police that Parker, whom he knew, was indeed the unmasked man in the house during the shooting. When Scott’s trial testimony identified Lynch, Parker buttressed Scott’s identification by relating Lynch’s “adopted” confession. With this change, the jury likely saw Parker as an observer, not a participant. It is, therefore, reasonable to assume that in weighing the evidence the jury gave substantial weight to Parker’s testimony relating the confession of Williams and implicating Lynch as being present at the killing. A confession of a perpetrator implicating the presence of a codefendant at the scene of a crime is inherently prejudicial.
Clearly, where the principal direct evidence against the accused is the testimony of an accomplice, the credibility of that witness will be a significant factor in the jury’s determi *365 nation of the accused’s level of culpability. [The Supreme Court has] consistently held that this credibility determination rests with the jury and is not subject to challenge on appeal merely because the testimony is self-serving, results from a favorable plea arrangement, or because the witness is himself a felon. However, here the issue is not the credibility of the witness, but rather the potential for harm caused by the erroneous admission of evidence which tends to support the jury’s credibility determination. In that context we must presume that such evidence had the potential to influence the jury into accepting the properly admitted evidence as more credible and, thus, to taint the jury’s determination of the facts.
Lilly v. Commonwealth, 258 Va. 548, 553, 523 S.E.2d 208, 210 (1999).
I would hold that it does not plainly appear that the error did not substantially and injuriously affect the verdict. The evidence, if successful in achieving its purpose, clearly would have affected the verdict. See Norfolk Ry. & Light Co. v. Corletto, 100 Va. 355, 360, 41 S.E. 740, 742 (1902) (holding that “[i]t is ... well settled that if a ... mistake of the court appear[s] in the record it must be presumed that it affected the verdict of the jury, and is therefore ground for which the judgment must be reversed, unless it plainly appears from the whole record that the error did not affect, and could not have affected, their verdict”).
For these reasons, I would reverse the convictions and remand for a new trial.