PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

v.

JOSEPH EDMUND WILLIAMS, a/k/a
Abdullah Shabazz, a/k/a Taharqa
Abdullah Shabazz,
  *Defendant-Appellant.*

No. 04-5126

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CR-04-160)

Argued: February 3, 2006

Decided: April 18, 2006

Before TRAXLER, GREGORY, and DUNCAN, Circuit Judges.

---

Affirmed in part, vacated in part, and remanded by published opinion.
Judge Traxler wrote the opinion, in which Judge Gregory and Judge
Duncan joined.

---

## COUNSEL

**ARGUED:** Geremy Charles Kamens, Assistant Federal Public
Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER,
Alexandria, Virginia, for Appellant. Patrick F. Stokes, Assistant
United States Attorney, Erik Russell Barnett, Assistant United States

Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Frank W. Dunham, Jr., Federal Public Defender, Meghan S. Skelton, Assistant Federal Public Defender, Alexandria, Virginia, for Appellant. Paul J. McNulty, United States Attorney, Alexandria, Virginia, for Appellee.

---

## OPINION

TRAXLER, Circuit Judge:

Joseph Williams, who had previously been convicted of a felony, was convicted of unlawful possession of a firearm and ammunition. *See* 18 U.S.C.A. § 922(g)(1) (West 2000). Over Williams's objection, the district court permitted the government to prove Williams's possession of a weapon through evidence linking Williams to the killing of Gail Collins. Because of the then-uncertain status of the Sentencing Guidelines,[1] the district court submitted additional questions to the jury after it returned the guilty verdict. The jury answered the questions and determined that the government had proven beyond a reasonable doubt that Williams killed Collins. Based on this factual finding, the district court at sentencing cross-referenced the guideline governing first-degree murder and imposed the life sentence required by the Sentencing Guidelines. *See* U.S.S.G. § 2K2.1(c)(1)(B).

Williams appeals, challenging his conviction and sentence. We affirm Williams's conviction, but we vacate his sentence and remand for re-sentencing.

### I.

Viewed in the light most favorable to the government, the evidence presented at trial established the following. Gail Collins was a conscientious employee of the United States Treasury Department who lived in Alexandria, Virginia. She was at work on March 11, 2003,

---

[1]Williams's trial took place in September 2004, after the Supreme Court's decision in *Blakely v. Washington*, 542 U.S. 296 (2004), but before its decision in *United States v. Booker*, 543 U.S. 220 (2005).

and indicated to co-workers that she would be at work for the rest of the week. Collins did not show up for work after March 11, nor did she call to say that she would be absent. Friends and family eventually began worrying and contacted police on March 21, 2003. Police entered Collins's apartment that day and found her body in the bedroom. She had been shot through the head execution-style, while she was kneeling and the killer was standing over her. The bullet went through her head, out through her cheek, and lodged in her shoulder. Collins's car keys, ATM card, and check register were missing, but nothing else in the apartment appeared to be disturbed, and there were no signs of forced entry. Records from the electronically operated front door of her apartment building showed that Collins entered the building on the night of March 11, but the records did not show that she entered the building after that.

Bank records revealed that Collins's ATM card had been used multiple times in the early morning hours of March 12. Between 2:00 and 2:30 a.m., $580 dollars in $20 bills had been withdrawn over the course of nine transactions. Those withdrawals caused Collins's account to be overdrawn for the first time since she opened it. There were other unsuccessful attempts to withdraw money a few hours later. During one of these unsuccessful attempts, an ATM camera took a picture of a woman identified by police officers as Kathleen Simmons, a crack addict and prostitute.

Simmons told police that on the night of March 11, she was standing on the street after missing the last bus, hoping that someone would give her a ride. Williams (whom she did not know before that evening) drove by and asked her if she knew where he could get some crack. She told him she did and hopped in his car. He drove her back to his apartment to smoke the little bit of crack that he had. Williams lived in the same apartment building as Collins; his apartment was on the 15th floor and hers was on the 11th floor. On the way up to his apartment, Williams paused the elevator on one of the floors below his floor, stepped out of the elevator, and looked up and down the hall.

After Williams and Simmons smoked Williams's crack, they got back in his car and he drove to a nearby ATM. He gave Simmons an ATM card and a PIN number and asked her to withdraw $400. The

ATM card belonged to Collins. When Simmons asked about the woman's name on the card, Williams said the card belonged to a friend and that they were breaking up. Simmons tried to withdraw money, but she was unsuccessful, because the account had already been overdrawn. Simmons got back in Williams's car and told him that she could not get any money. Simmons then directed Williams to a housing project in the District of Columbia where they could buy crack. Williams gave Simmons $120 or $140 in crisp $20 bills, and she returned with 15 "dime" bags of crack cocaine. They returned to Williams's apartment to smoke the crack. As Williams was getting out of the car, Simmons saw him reach under his seat and retrieve an object that he put inside his pants. On the way up to his apartment, Williams again stopped the elevator on a lower floor, got out, looked up and down the hall, and then got back inside the elevator. Once on the 15th floor, Williams went into a trash room, where Simmons saw him take a gun from inside his waistband and place it on top of the air-conditioning duct. He removed ammunition from his pocket once they were inside the apartment.

After Williams and Simmons smoked the crack they had bought, Williams left for work, but he returned about an hour later. He gathered up CDs, which he and Simmons sold at a music store for about $100. Williams and Simmons then bought more crack, which they smoked at his apartment. After the drugs were gone, Williams took Simmons to her friend's house. Simmons never saw Williams again.

Simmons was the government's star witness at trial, and she testified to the facts outlined above. The defense, however, had several grounds upon which to impeach Simmons's credibility. First, Simmons was an admitted drug addict and prostitute. In addition, she had been shot in the head and was left with brain damage, had auditory and visual hallucinations, and took multiple psychiatric medications. Nonetheless, much of Simmons's story was corroborated. The manager of the music store recognized Simmons as having sold CDs with Williams, and the superintendent of Williams's apartment building saw Simmons in the building with Williams on the morning of March 12. And while there was no evidence indicating that Simmons knew Collins, the government presented evidence showing that Williams knew Collins. Williams had helped Collins out from time to time, and

Williams brought Collins with him to his niece's house on one occasion.

The government also presented evidence that suggested a motive for the killing. In the months before Collins was killed, Williams's drug addiction appeared to be spiraling out of control. Williams was buying hundreds of dollars worth of crack every other day from Keith Bartee and staying up until the wee hours of the morning smoking the crack with Bartee and Bartee's girlfriend. Williams was having severe money problems around this same time. He quit making car payments in November 2002, stopped paying rent in January 2003, and was officially evicted in late March 2003. He cashed out vacation time at work, asked friends and family for money, stole money from his bank by making ATM withdrawals after making phony ATM deposits, and stole a check from a friend, forging her signature and making it payable to him in the amount of $4,000. Williams had also been getting money from Collins. About a week or so before she died, Collins told her mother and her niece that she was not going to give Williams any more money.

In the weeks after Collins's body was discovered, Williams made statements that could be viewed as evidence of his guilt. After being interviewed by the police, Williams's niece asked him if he had killed Collins. Williams told her that it was "none of [her] concern," J.A. 833, and that what she "[did]n't know wouldn't hurt" her. J.A. 852. In addition, Keith Bartee, Williams's main drug supplier, became concerned about Williams's strange and paranoid behavior. Bartee asked Williams if he had killed someone, and Williams remained silent.

Although the weapon used to kill Collins was never found, Williams was charged with unlawful possession of a firearm and ammunition by a felon and user of illegal drugs. *See* 18 U.S.C.A. §§ 922(g)(1) & (3). The jury found Williams guilty.

Collins was murdered in March 2003, and the case was headed for trial in the summer of 2004. Before the case went to trial, the Supreme Court issued its opinion in *Blakely v. Washington*, 542 U.S. 296 (2004). The government, to protect its ability to sentence Williams based on his involvement in Collins's murder, obtained a super-

seding indictment that included allegations about the murder, and the district court announced its intention to submit sentencing issues to the jury. Before the trial started, however, this court issued its opinion in *United States v. Hammoud*, 381 F.3d 316 (4th Cir. 2004) (en banc),[2] which concluded that *Blakely* did not apply to proceedings under the Sentencing Guidelines. *See id.* at 349-50. Notwithstanding *Hammoud*, the district court proceeded with its plan to submit sentencing factors to the jury. Accordingly, immediately after the jury returned the guilty verdict, the court sent the jurors back to answer several special interrogatories related to sentencing. The jury answered these interrogatories and concluded that the government had proved beyond a reasonable doubt that Williams killed Collins, that he killed her with malice, that the killing was premeditated and deliberate, and that he killed her during the commission of or an attempt to commit robbery.

Sentencing for felon-in-possession charges is governed by section 2K2.1 of the Sentencing Guidelines. Section 2K2.1 provides that if the defendant used or possessed any firearm in connection with another offense that resulted in death, the most analogous guideline for homicides should be applied, if application of the homicide guideline yields a higher offense level. *See* U.S.S.G. § 2K2.1(c)(1)(B). In light of the jury's answers to the special interrogatories, the most analogous guideline was U.S.S.G. § 2A1.1, governing first-degree murder. The offense level under § 2A1.1 is 43, which carries with it a mandatory life sentence regardless of the criminal history category. Accordingly, the district court sentenced Williams to life, noting more than once during the sentencing proceeding that the sentence was required by the Guidelines. The district court did not announce an alternative sentence that it would have imposed had the Guidelines not been mandatory.

## II.

In this appeal, Williams first contends that the district court erred by permitting the government to present evidence of Collins's murder. According to Williams, the evidence was unfairly prejudicial and

---

[2]After deciding *Booker*, the Supreme Court vacated *Hammoud*. *See Hammoud v. United States*, 543 U.S. 1097 (2005).

should have been excluded under Rule 403 of the Federal Rules of Evidence. We disagree.

Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. There is no doubt that the evidence of the Collins murder was prejudicial to Williams, just as all evidence suggesting guilt is prejudicial to a defendant. However, "[t]he mere fact that the evidence will damage the defendant's case is not enough—the evidence must be *unfairly* prejudicial, and the unfair prejudice must *substantially* outweigh the probative value of the evidence." *United States v. Hammoud*, 381 F.3d 316, 341 (4th Cir. 2004) (en banc) (internal quotation marks omitted), *vacated on other grounds*, 543 U.S. 1097 (2005). Evidence is unfairly prejudicial and thus should be excluded under Rule 403 "when there is a genuine risk that the emotions of a jury will be excited to irrational behavior, and . . . this risk is disproportionate to the probative value of the offered evidence." *United States v. Aramony*, 88 F.3d 1369, 1378 (4th Cir. 1996) (internal quotation marks omitted).

This court has upheld over a Rule 403 objection the use of evidence of a shooting in order to prove weapons charges made against the defendant. For example, in *United States v. Grimmond*, 137 F.3d 823 (4th Cir. 1998), we rejected an argument that Rule 403 barred introduction of evidence of two shootings (one fatal) in a case where the defendant was charged with multiple counts of drug and weapons possession. The defendant shot and killed the first of his victims because the victim had been "giving him looks that made him feel unsafe," *id.* at 826, and then shot the second victim because he knew too much about the first shooting. *Id.* We noted that the evidence of the shootings directly established one of the elements of the § 922(g) charge—possession of a firearm—and thus was highly probative. As to the question of unfair prejudice, we stated:

> Perhaps Grimmond's case was damaged when the jury heard evidence that he shot two individuals. However, damage to a defendant's case is not a basis for excluding probative evidence. And for good reason. Evidence that is highly

probative invariably will be prejudicial to the defense. It is worth remembering that the touchstone for excluding evidence under Rule 403 is not prejudice, but "unfair" prejudice. Moreover, unfair prejudice must "substantially" outweigh the probative value of the evidence. We have no difficulty in concluding that it was not unfairly prejudicial for the Government to introduce evidence that Grimmond shot Feaster and Kinney.

*Id.* at 833 (citations omitted).

Similarly, in *United States v. Myers*, 280 F.3d 407 (4th Cir. 2002), we found no error in the admission in a trial on drug and weapons charges evidence that the defendant killed a drug customer:

The district court did not abuse its discretion [by admitting evidence of the murder]. Given the testimony of the state police firearms expert that Myers' firearm was the one used to kill Shilot, the court correctly found that evidence regarding the shooting of Shilot had substantial probative value. It was directly relevant to whether Myers was a felon in possession of a firearm . . ., whether he possessed and used a firearm in furtherance of drug trafficking. . ., and whether he knowingly possessed a firearm with an obliterated serial number. . . .

In addition, the district court did not abuse its discretion in determining that the probative value of the shooting was not "substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. This evidence was certainly damaging to Myers and possibly prejudicial as well. But it was not unfairly prejudicial.

*Id.* at 413-14; *see also United States v. Higgs*, 353 F.3d 281, 311-12 (4th Cir. 2003) (in murder case where no gun was recovered, finding evidence of earlier uncharged shooting to be admissible because bullets in uncharged shooting matched bullets recovered from the murder victims); *United States v. Melton*, 970 F.2d 1328, 1336 (4th Cir. 1992) (affirming district court's decision to admit evidence that the defendant charged with drug-related offenses killed an informant).

Williams, however, contends that these cases are distinguishable because the evidence in them more clearly and directly tied the defendants to the shootings. Williams contends that the evidence connecting him to the Collins murder is purely circumstantial and too speculative to justify its admission, because this court has countenanced the admission of evidence of an uncharged murder only when the evidence linking the defendant to the murder is overwhelming. We disagree.

Preliminarily, we note that while some (but certainly not all) of the evidence connecting Williams to Collins's murder may be circumstantial, circumstantial evidence is not inherently less valuable or less probative than direct evidence. *See Holland v. United States*, 348 U.S. 121, 140 (1954) ("Circumstantial evidence . . . is intrinsically no different from testimonial evidence."); *United States v. Espaillet*, 380 F.3d 713, 719 (2d Cir. 2004) (explaining that circumstantial evidence "is of no less intrinsic worth than direct evidence and, indeed, circumstantial evidence alone may support a guilty verdict"). Thus, the presence of circumstantial evidence provides no basis to distinguish this case from the cases where similar evidence was admitted.

More importantly, however, there is simply no basis in the language of Rule 403 or our cases applying Rule 403 that would permit a heightened standard to be applied when the evidence sought to be excluded involves an uncharged murder. Nor does the rule operate differently when the evidence sought to be excluded is circumstantial rather than direct. To be sure, both factors—that the evidence is circumstantial and involves an uncharged murder—will be included in the Rule 403 calculus of determining whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. Thus, in a case where the evidence sought to be excluded is circumstantial evidence that is only weakly probative of a minor point, a defendant might have an easier time convincing the district court that the danger of unfair prejudice substantially outweighs the minimal probative value of the evidence. Similarly, the danger of unfair prejudice is more likely to be present in a case where the challenged evidence is a type that is highly likely to inflame the passions of the jurors, and the district court will consider the increased likelihood of unfair prejudice when determining whether the evidence should be admitted. Nonetheless, the Rule 403 inquiry—determining whether

the danger of unfair prejudice substantially outweighs the probative value of the evidence—remains the same in all cases, regardless of the nature or type of the challenged evidence.

While Williams suggests that the district court erred as a matter of law in admitting the evidence of the Collins murder because the evidence connecting him to the murder was not overwhelming, what Williams is really arguing is that the district court incorrectly struck the Rule 403 balance. The weighing of the evidence and balancing of the Rule 403 scale, however, is a discretionary task vested with the district court. "Because the evidence sought to be excluded under Rule 403 is concededly probative, the balance under Rule 403 should be struck in favor of admissibility, and evidence should be excluded only sparingly." *Aramony*, 88 F.3d at 1378. A district court's decision to admit evidence over a Rule 403 objection will not be overturned "except under the most extraordinary of circumstances, where that discretion has been plainly abused." *United States v. Simpson*, 910 F.2d 154, 157 (4th Cir. 1990) (internal quotation marks omitted). "Such an abuse occurs only when it can be said that the trial court acted arbitrarily or irrationally in admitting evidence." *Id.* (internal quotation marks omitted).

In this case, we simply cannot conclude that the district court acted irrationally or arbitrarily when determining that the probative value of the Collins evidence was not substantially outweighed by the danger of unfair prejudice. The evidence surrounding Collins's murder was clearly relevant to the § 922(g) charges. A determination that Williams shot Collins obviously would demonstrate that Williams possessed a firearm, and the evidence of the Collins murder would also establish that the firearm that Williams possessed was operable and thus satisfied the statutory definition of "firearm." *See* 18 U.S.C.A. § 921(a)(3) (West 2000) ("The term 'firearm' means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.").[3] A firearms expert testified that the bul-

---

[3]Although § 921(a)(3) does not require that the firearm be operable when the defendant possessed it, *see United States v. Adams*, 137 F.3d 1298, 1300 (11th Cir. 1998) (per curiam); *United States v. Willis*, 992 F.2d 489, 491 n.2 (4th Cir. 1993), an operable firearm certainly meets the statutory definition.

let recovered from Collins was not manufactured in Virginia and that none of the guns that the bullet fit were manufactured in Virginia, testimony which established the interstate commerce requirement of section 922(g). The evidence was thus highly probative of the charges against Williams. And contrary to Williams's contention, the presence of some circumstantial evidence did not render the evidence speculative or otherwise reduce its probative value.

The evidence presented by the government directly and quite compellingly tied Williams to the murder of Gail Collins. The government established through direct evidence (the testimony of Williams's niece and Collins's mother and niece) that Williams knew Collins, that Williams had received money from Collins, and that shortly before her death Collins had declared that she would not give any more money to Williams. The government presented direct evidence establishing that Williams had a serious and very expensive drug habit, as well as evidence of Williams's mounting financial problems. The government tied its evidence together with direct evidence (the testimony of Kathleen Simmons) that Williams had Collins's ATM card and PIN number in the early morning hours after the last night that Collins was known to be alive and very strong circumstantial evidence pointing to Williams as Gail Collins's murderer. For example, the government's circumstantial evidence showed that on the night Williams had Collins's ATM card and PIN number, multiple early-morning ATM transactions ended up overdrawing Collins's checking account for the first time since she opened the account and that Williams behaved very strangely in the apartment building the night that he gave Collins's ATM card to Simmons, stopping the elevator on a floor below his apartment and stepping out to look up and down the hallway.

To be sure, the evidence of the Collins murder was prejudicial to Williams, as is all evidence tending to show a defendant's guilt. *See Grimmond*, 137 F.3d at 833 ("Evidence that is highly probative invariably will be prejudicial to the defense."). Whether or not the evidence overwhelmingly linked Williams to Collins's murder, it was strong evidence of Williams's involvement in the murder. And while evidence of an uncharged murder certainly carries with it some risk that it will incite the emotions of the jurors, the evidence was also highly probative of the weapons-possession charge against Williams,

and the district court instructed the jury to consider the evidence only for the limited purpose of showing that Williams had possessed a firearm in violation of § 922(g). Under these circumstances, we cannot say that the district court acted arbitrarily or irrationally when concluding that the risk of unfair prejudice did not substantially outweigh the probative value of the evidence. *See Aramony*, 88 F.3d at 1378; *see also Grimmond*, 137 F.3d at 833; *Myers*, 280 F.3d 413-14; *Higgs*, 353 F.3d at 311-12.

### III.

Williams also contends that the district court erred by refusing to strike from the indictment allegations about the Collins murder. *See* Fed. R. Crim. P. 7(c)(1) ("The indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged and must be signed by an attorney for the government."); Fed. R. Crim. P. 7(d) ("Upon the defendant's motion, the court may strike surplusage from the indictment or information."). Williams argues that including the allegations in the indictment might have been proper after *Blakely*, but that they were improper after the opinions in *Hammoud* and *Booker* were issued, because those cases made it clear that the jury had no role in the sentencing process.

"The purpose of Rule 7(d) is to protect a defendant against prejudicial allegations that are neither relevant nor material to the charges made in an indictment, or not essential to the charge, or unnecessary, or inflammatory." *United States v. Poore*, 594 F.2d 39, 41 (4th Cir. 1979) (citations omitted). A district court's ruling on a motion to strike is reviewed for abuse of discretion. *Id.*

"[A] motion to strike surplusage from the indictment should be granted only if it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial." *United States v. Rezaq*, 134 F.3d 1121, 1134 (D.C. Cir. 1998) (internal alteration and quotations marks omitted); *see also United States v. Hedgepeth*, 434 F.3d 609, 612 (3d Cir. 2006) ("[I]nformation that is prejudicial, yet relevant to the indictment, must be included for any future conviction to stand and information that is irrelevant need not be struck if there is no evidence that the defendant was prejudiced by its inclusion.").

Given our conclusion that the evidence of the Collins murder was not unfairly prejudicial, we fail to see how Williams could have been prejudiced by the inclusion of those allegations in the indictment, particularly since the indictment was not given to the jury and the district court specifically instructed the jury that the indictment was not evidence. The district court, therefore, did not abuse its discretion by denying the motion to strike. *See United States v. Hartsell*, 127 F.3d 343, 353 (4th Cir. 1997) (finding no abuse of discretion in denial of motion to strike alleged surplusage from indictment where defendant was not prejudiced by the allegations at issue).

## IV.

During the presentation of its case, the government called as a witness Keith Bartee, Williams's main drug supplier. Bartee testified that he asked Williams whether he had killed someone but Williams did not respond. On appeal, Williams contends that his silence in response to Bartee's question was inadmissible hearsay. In a related argument, Williams contends that the government's reference in closing argument to Bartee's testimony amounted to an improper comment on Williams's silence.

## A.

Bartee testified about Williams's strange behavior around the time of Collins's murder. Bartee testified that sometime in March, Williams suddenly stopped showing up at the hotel where Bartee sold crack. Bartee finally called Williams and asked him what was wrong. According to Bartee, Williams "told me that something was, you know, something was wrong and he didn't want us to be involved with it. I don't know, I guess it was something he had done, and he didn't want me to be involved with the police." J.A. 947.

About a week after that telephone conversation, Bartee called Williams again to see if he would give him a ride to a laundromat. Bartee and Williams ended up smoking crack in several different locations, and Williams behaved strangely the entire time. Bartee testified that Williams "wasn't himself," J.A. 949, and that Williams "kept saying the police w[ere] following him." J.A. 951-52. Bartee found this behavior puzzling, because Williams "was always calm and cool."

J.A. 952. Williams and Bartee eventually decided to go to Williams's apartment to smoke more crack. While in the apartment, Williams continued to behave strangely. Bartee asked him what was wrong, but Williams did not respond. After about 40 minutes, the crack was gone, and Bartee and Williams left the apartment. On the elevator ride down, Bartee asked Williams if he was seeing any women in the building. Williams said that "there was a lady downstairs," but that he did not have any "sexual contact" with her. J.A. 952. Bartee testified that Williams mentioned something about "some guys that went down there," but that Williams never said "what happened." J.A. 952-53. The exchange about which Williams complains on appeal then took place. While still in the elevator, Bartee again "asked him what was wrong. I asked him, did he, you know, did he kill somebody or what? You know, like I say, he didn't say anything. He was blank. He didn't say . . . . Like I say, I never knew what was wrong." J.A. 953.

### B.

Williams contends that the district court treated his failure to answer Bartee's question as an adoptive or tacit admission. Williams argues that the exchange does not qualify as an adoptive admission and that the district court therefore erred by admitting it.

Generally speaking, statements made by a party opponent are excluded from the definition of hearsay and are admissible in court. *See* Fed. R. Evid. 801(d)(2)(A). A statement made by someone else may be treated as a statement of the party if the party adopts that statement. *See* Fed. R. Evid. 801(d)(2)(B) (defining as not hearsay a "statement of which the party has manifested an adoption or belief in its truth"). "A party may manifest adoption of a statement in any number of ways, including through words, conduct, or silence." *United States v. Robinson*, 275 F.3d 371, 383 (4th Cir. 2001) (internal alteration omitted).

> When a statement is offered as an adoptive admission, the primary inquiry is whether the statement was such that, under the circumstances, an innocent defendant would normally be induced to respond, and whether there are sufficient foundational facts from which the jury could infer that

the defendant heard, understood, and acquiesced in the statement.

*Id.* (quoting *United States v. Jinadu*, 98 F.3d 239, 244 (6th Cir. 1996)).

Williams argues that his silence when Bartee asked if he had killed someone does not qualify as an adoptive admission. He contends that Bartee's question did not accuse him of committing a crime. Because the question was not accusatory, Williams argues that his failure to respond cannot be treated as a tacit or adoptive admission. We agree.

The adoptive-admission doctrine permits statements of others to be treated by the jury as statements of the party—it is as if the party himself made the statement. If someone says in the defendant's presence that "this is the money the defendant got when he robbed the bank," it is logical for the jury to conclude that the defendant would have spoken up if he in fact had not robbed the bank. Thus, a jury would be entitled to treat the robbed-the-bank statement as if it had been made by the defendant himself. *Cf. United States v. Ward*, 377 F.3d 671, 675-76 (7th Cir. 2004).

If the defendant remains silent in the face of a question, however, the adoptive admissions analysis is not always appropriate. If the question is highly accusatory (for example, "Why did you rob the bank?"), the adoptive admissions would be proper, because a jury could reasonably view the failure to answer as an adoption of the accusatory statement that is the premise of the question—that the defendant robbed the bank. *Cf. Folston v. Allsbrook*, 691 F.2d 184, 187 (4th Cir. 1982) (finding no error in the admission of evidence that defendant failed to respond when a cellmate "asked [the defendant] why did he shoot the man"); *see also* John Strong, *McCormick on Evidence* § 161 (explaining that for silence to be admitted as a tacit admission, there must be "preliminary proof . . . of an *accusatory statement*" (emphasis added). The question in this case is not so accusatory. Bartee did not accuse Williams of killing someone and ask him to explain it, but instead simply asked if Williams had killed someone. Because there is no accusatory statement implicit in the question, there is no statement that Williams could have adopted by remaining silent. We therefore agree with Williams that the exchange

with Bartee is not admissible as an adoptive admission under Rule 801(d)(2)(B).

That the adoptive admissions analysis is inappropriate, however, does not mean that the district court erred by admitting the testimony.[4] Evidence of Bartee's question helped establish that Williams was behaving quite strangely around the time of Collins's murder—so strangely that a good friend felt compelled to ask him if he had committed a crime. The question was thus not offered to prove the truth of the matter asserted and was not hearsay. *See* Fed. R. Evid. 801(c) (defining "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted").[5] Similarly, Williams's failure to answer was not hearsay but was additional relevant evidence of his strange behavior, and it was for the jury to decide what inference should be drawn from Williams's silence in the face of Bartee's non-accusatory question. *See* Fed. R. Evid. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."); *see also United States v. Leftenant*, 341 F.3d 338, 346 (4th Cir. 2003) ("[R]elevance typically presents a low barrier to admissibility. Indeed, to be admissible, evidence need only be worth consideration by the jury, or have a plus value." (citation and internal quotation marks omitted)).

Even if we were to conclude that evidence of Williams's failure to answer Bartee's question was improperly admitted, the error would be harmless, because the evidence was cumulative to other unobjected-to evidence. *See United States v. Clarke*, 2 F.3d 81, 85 (4th Cir. 1993) (holding that the admission of cumulative testimony was harmless).

---

[4]We note that the district court did not rely on the adoptive admissions analysis when admitting the evidence. The court simply overruled, with little explanation, Williams's hearsay objection.

[5]Even if the question could be viewed as hearsay, it demonstrated Bartee's state of mind when he asked the question and thus would be admissible as an exception to the prohibition against hearsay. *See* Fed. R. Evid. 803(3).

Williams's niece Julia was a reluctant witness for the government. After police talked to her about Collins's murder, she asked Williams if he had killed Collins. Williams responded that "[i]t was none of [her] concern," J.A. 833, and that "what you don't know won't hurt you." J.A. 852. The inference of guilt to be drawn from these statements is much stronger than any inference that would be drawn from Williams's failure to answer Bartee's question, as these responses quite clearly suggest that Williams in fact killed Collins. Accordingly, even if we were to conclude that the Bartee exchange should not have been admitted, it was cumulative to the properly admitted testimony of Williams's niece, and any error was thus harmless.[6]

## C.

During closing argument, the prosecutor when discussing Bartee's testimony argued that:

> You also know that the defendant killed Gail Collins because he as much as said so to friends and family. You heard from Keith Bartee. He was with the defendant, and the defendant mentioned that something bad happened to a woman. And he later told Keith Bartee . . . when he was in his building that something bad happened to a woman downstairs, and Keith asked him and said, "Did you kill somebody?" And the defendant didn't say anything. Is silence what an innocent man does? Does an innocent man not protest when somebody asks?

J.A. 1103-04. Williams contends that Bartee never accused Williams of killing anyone and that only the government has ever accused Williams of killing Collins. Williams thus claims that by arguing to the jury that an "innocent man" would protest when being accused of kill-

---

[6]In his reply brief, Williams argues in passing that his niece's testimony was likewise inadmissible as an adoptive admission. *See* Reply Brief at 12. Because Williams did not object to Julia's testimony at trial and did not challenge the issue in his original brief, this argument comes far too late in the day. *See, e.g.*, *United States v. Al-Hamdi*, 356 F.3d 564, 571 n.8 (4th Cir. 2004) (declining to consider issue first raised in reply brief).

ing someone, the government's argument must be viewed as a comment on Williams's failure to testify at trial. This argument is without merit.

To determine whether argument constitutes an improper comment on the defendant's right to refuse to testify, the question is whether "the language used manifestly [was] intended to be, or was it of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Francis*, 82 F.3d 77, 78 (4th Cir. 1996) (internal quotation marks omitted). The government argued that an innocent man would protest when *asked* if he had killed someone. In context, it is abundantly clear that these comments were in reference to Williams's failure to answer Bartee's question and were not improper comments on Williams's refusal to testify at trial.[7] Whether or not Bartee's question was sufficiently accusatory to trigger the adoptive admissions analysis simply cannot transform the government's statement into an improper comment on the failure to testify. Because the jury would not naturally or necessarily have taken the government's closing argument to be a comment on Williams's right to refuse to testify, the closing argument was proper.

V.

Williams contends that the district court erred by denying his motion for a continuance. Before we address this issue, an explanation of the procedural background is in order.

---

[7]In the course of this argument, Williams mentions that the government misrepresented Bartee's testimony in its closing argument, because Williams never told Bartee that something bad had happened to the woman in his building. *See* Brief of Appellant at 30, n.4. Although Bartee testified that Williams told him something had happened, Bartee did not testify that Williams told him that something bad had happened to the woman in his apartment building. Nonetheless, Williams did not object to the closing argument on the grounds that it misstated the evidence, and Williams does not argue on appeal that the misstatement entitles him to any relief.

## A.

The discovery order entered by the district court required the government to provide Williams with *Brady* and *Giglio* material one week before trial.[8] Consistent with that order, the government one week before trial informed Williams that Kathleen Simmons, the government's star witness, had been treated for years for schizophrenia and suffered from visual and auditory hallucinations. Williams sought a continuance to give him time to investigate her problems. The district court held a hearing on that and other pending motions on Wednesday, September 15, with trial scheduled to begin on Monday, September 20. The court ordered the government to find Simmons's medical records and submit them to the court for review. The court explained that schizophrenia was a common diagnosis, and that with the names of Simmons's medications that the defense had been given, there was time for the defense to research the issue and conduct an effective cross-examination. The court thus denied the continuance motion, but noted that the decision could change if there was something unusual in the medical records.

The government submitted Simmons's medical records to the district court on Thursday. The records revealed that Simmons reported seeing ghosts and hearing voices even while on her medication; that she had been shot in the head in 1998 and suffered organic brain damage, which exacerbated her delusions; and that she complained in 2003 of having difficulty seeing. The court ordered the government to provide the medical records to Williams by 1:00 p.m. Friday. The court ordered counsel for Williams to keep the records under seal and to request permission from the court before using the information contained in the records.

At trial, counsel for Williams was able to use the information learned through the medical records to impeach Simmons during cross-examination. Counsel for Williams had tried unsuccessfully to

---

[8]*See Brady v. Maryland*, 373 U.S. 83, 87 (1963) (requiring the government to furnish the defendant with all exculpatory evidence that is material to guilt or punishment); *Giglio v. United States*, 405 U.S. 150, 154-55 (1972) (requiring the government to furnish the defendant with material evidence affecting the credibility of government witnesses).

locate the intern who had performed a psychological evaluation of Simmons, and the district court refused to admit a report of that evaluation prepared by the intern. However, counsel was able to call as a witness Dr. Rachna Varia, the clinical psychologist who supervised the intern and reviewed the report prepared after the evaluation. Although the district court refused to admit the report through Dr. Varia, counsel for Williams was able to elicit a substantial amount of information from Dr. Varia. Dr. Varia testified that Simmons had "periods of impaired reality testing," which meant that Simmons might "experience auditory hallucinations, visual hallucinations, have impaired judgment, and have problems deciphering what is real and what is not." J.A. 1046. Dr. Varia also testified that Simmons had memory problems, explaining that Simmons "showed problems in recall, and so after an immediate and delayed time, she has difficulty remembering all the information that she might have seen." J.A. 1047. Dr. Varia testified about the general effects of crack cocaine—that it can impair judgment, observation, and visual and auditory memory. Dr. Varia also testified that someone with Simmons's cognitive impairments and memory problems who had been smoking crack cocaine for several hours with another person could two weeks later have a significantly impaired ability to identify that person.

B.

On appeal, Williams contends that the government's last-minute disclosure of Simmons's problems required the district court to grant his motion for a continuance. If a continuance had been granted, Williams contends that he could have located the intern who evaluated Simmons, called her as a witness, and introduced her report of the evaluation. Williams argues that without that evidence, he was unable to effectively test Simmons's credibility. Thus, Williams argues that the denial of a continuance violated his Sixth Amendment right to effectively confront the witnesses against him.

"[B]road discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel." *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) (internal quotation marks omitted). "[A] trial court's denial of a continuance is . . . reviewed for abuse of discretion; even if such an

abuse is found, the defendant must show that the error specifically prejudiced her case in order to prevail." *United States v. Hedgepeth*, 418 F.3d 411, 419 (4th Cir. 2005). We find no abuse of discretion in this case.

Although Williams insists that the government's disclosure of Simmons's psychological problems was "tardy," the government disclosed Simmons's problems to Williams a week before trial, in accordance with the deadlines set out in the discovery order.[9] The district court concluded that a week was sufficient time for counsel to prepare to cross-examine Simmons about her psychiatric problems. While a defense attorney can always make good use of additional time to prepare for trial, the thoroughness of Williams's cross-examination of Simmons and presentation of evidence through Dr. Varia confirms that the district court was correct in its assessment of the time needed to prepare.

The government elicited many details from Simmons about her psychological problems, including the fact that she saw ghosts or spirits and heard voices. Counsel for Williams was able to cross-examine Simmons about her psychiatric problems, and Simmons admitted that she has hallucinations even when taking her medication. Counsel was also able to make effective use of Simmons's status as a crack addict and prostitute. Simmons admitted on cross-examination that she had smoked crack three days in the week before trial and that she was undergoing detoxification during trial. Simmons also admitted that in the week before trial, she had engaged in acts of prostitution three times to order to get the money she needed to buy crack. In addition to cross-examining Simmons on the many areas that called her credibility into doubt, counsel for Williams was able to bring in an expert witness who testified in detail about the nature of Simmons's psychological problems and the effects that Simmons's medical problems and illicit drug use had on her memory and her ability to perceive reality. Because Williams was able to throughly explore before the jury the many issues that called Simmons's credibility into question, we cannot conclude that the district court abused its discretion in

---

[9]The government represented to the court that it had learned of Simmons's problems on Saturday, two days before it disclosed the information to Williams.

denying Williams's request for a continuance. *See, e.g.*, *United States v. Lawrence*, 161 F.3d 250, 254 (4th Cir. 1998) ("A district court is entitled to broad discretion with respect to a decision to deny a continuance. Furthermore, absent a presumption of prejudice, specific errors must be shown which undermine confidence in the outcome of the trial to constitute reversible error." (citation and internal quotation marks omitted)); *cf. United States v. Cole*, 293 F.3d 153, 163 (4th Cir. 2002) (rejecting defendant's claim that government breached its *Brady* obligations by waiting until a weekend break in trial after the close of its case to disclose that key witness suffered from psychiatric problems; since court permitted defendant to recall witness to cross-examine him about his psychiatric problems, "counsel did receive enough information about [the witness's] disorders in time for its effective use at trial" (internal quotation marks omitted)).

We recognize, of course, that the denial of a motion for continuance could, under certain circumstances, implicate a defendant's right to present a defense or to confront the witnesses against him. *See, e.g.*, *United States v. Garman*, 748 F.2d 218, 221-22 (4th Cir. 1984); *United States v. Jordan*, 466 F.2d 99, 101 (4th Cir. 1972). Although Williams was unable to locate and call as a witness the intern who performed the psychological evaluation of Simmons and was unable to introduce into evidence the report of the evaluation, no avenue of cross-examination was foreclosed to Williams by the district court's denial of the requested continuance. Williams was able to cross-examine Simmons about her psychiatric problems, and he was also able to present his own expert witness who testified about the nature of the problems suffered by Simmons. Given the degree to which Simmons was already impeached and the specific medical information that was presented to the jury by Dr. Varia, the denial of a continuance at most prevented Williams from presenting some additional information to the jury about the nature and scope of Simmons's problems. Because Williams was able to adequately explore this issue on cross-examination of Simmons and through the testimony of his expert witness, we simply cannot conclude that Williams's inability to impeach Simmons to a somewhat greater degree can be viewed as a violation of his constitutional rights. *See Garman*, 748 F.2d at 223 (concluding that denial of continuance sought to obtain testimony of two witnesses did not deprive defendant of his right to present a defense because "[t]here is nothing new in what defendant sought to

present through the two witnesses"); *Jordan*, 466 F.2d at 101-02 (concluding that denial of a continuance to a defendant who had not been given the names of the witnesses who would testify for the prosecution until the day of trial did not violate the defendant's Sixth Amendment confrontation rights because the defendant was able to impeach the credibility of the witnesses and any further impeachment "would have been cumulative"); *see also United States v. Garcia*, 854 F.2d 1280, 1284 (11th Cir. 1988) (finding no abuse of discretion in denial of continuance where denial merely prevented defendant from presenting cumulative evidence).

## VI.

Section 922(g) makes it unlawful for people in specified categories "to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C.A. § 922(g). Williams contends that the government failed to present sufficient evidence of the interstate commerce element. This argument is without merit.

The requisite connection to interstate commerce can be satisfied through proof that the firearm or ammunition is manufactured in one state and possessed in another. *See United States v. Gallimore*, 247 F.3d 134, 138 (4th Cir. 2001) ("[T]he Government may establish the requisite interstate commerce nexus by showing that a firearm was manufactured outside the state where the defendant possessed it."). The government presented expert testimony indicating that the 9-mm bullet that was retrieved from Collins's body was not homemade and was manufactured outside of Virginia and that no 9-mm guns are manufactured in Virginia. Because Collins was murdered in Virginia, that evidence was sufficient to satisfy the interstate commerce requirement of section 922(g).

## VII.

Finally, Williams argues that his sentence was imposed in violation of the principles set out in *United States v. Booker*, 543 U.S. 220 (2005), and that he is therefore entitled to a remand for re-sentencing.

The government agrees with Williams's position on this point, as do we.

Broadly speaking, there are two types of *Booker* sentencing errors. The first kind of error—the Sixth Amendment or constitutional error —occurs if a sentencing court "enhances a sentence beyond the maximum authorized by facts found by a jury beyond a reasonable doubt or admitted by the defendant." *United States v. Rodriguez*, 433 F.3d 411, 414 (4th Cir. 2006). The second kind of error—sometimes called a statutory *Booker* error—occurs if the sentencing court "treats the Guidelines as mandatory, rather than as advisory." *Id.*

In this case, the jury's findings with regard to the Collins murder may well eliminate the Sixth Amendment error arising from the application of the murder cross-reference. Nonetheless, a statutory *Booker* error occurred because the district court treated the Guidelines as mandatory. Williams made a timely *Blakely* objection below, and that objection was sufficient to preserve for appeal the district court's statutory error in treating the Guidelines as mandatory. Thus, we review the sentencing error for harmlessness. *See Rodriguez*, 433 F.3d at 415 ("Rodriguez properly preserved his claim of statutory *Booker* error by raising a timely *Blakely* objection at sentencing. We are therefore obliged to review his preserved claim of statutory *Booker* error for harmless error.").

Under harmless error review, the burden is on the government to prove that the district court would not have imposed a lesser sentence if it had known that the Guidelines were not mandatory. *See id.* at 416. Because the record is devoid of any such indication, a remand for re-sentencing is required. *See id.* ("[T]he court offered no indication of whether it might have imposed a different sentence had it considered the § 3553(a) factors under an advisory Guidelines regime. . . . The prejudice burden therefore falls on the Government, and the sentencing court's silence must be interpreted in favor of Rodriguez. Accordingly, we must conclude that Rodriguez was prejudiced when the court treated the Guidelines as mandatory. We are thus obliged to vacate Rodriguez's sentence and remand for further proceedings.").

## VIII.

Accordingly, for the foregoing reasons, we hereby affirm Williams's conviction. However, because the district court erred by treat-

ing the Guidelines as mandatory and there is no indication in the record that the court would have imposed the same sentence under an advisory system, we vacate Williams's sentence and remand for re-sentencing.

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*