NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0038n.06

Case No. 12-2218

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
|  | ) | JAN 16, 2014 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
|  | ) |  |
| v. | ) |  |
|  | ) | ON APPEAL FROM THE |
| KEVIN WATSON, | ) | UNITED STATES DISTRICT |
|  | ) | COURT FOR THE EASTERN |
| Defendant-Appellant. | ) | DISTRICT OF MICHIGAN |
|  | ) |  |
|  | ) | O P I N I O N |

BEFORE: SUTTON, MCKEAGUE, and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Kevin Watson was convicted by a jury of conspiracy to commit bank robbery, 18 U.S.C. §§ 317, 3113(a); bank robbery, 18 U.S.C. §§ 2113(a), (e); and murder with a firearm during and in relation to a violent crime, 18 U.S.C. § 924(j). He appeals, asserting that the district court erred by admitting into evidence portions of a recording made by a jailhouse informant as well as hearsay testimony deemed to be an "admission by silence" on Watson's part, and, further, that prosecutorial misconduct during closing arguments and the cumulative effect of these errors denied him a fair trial. We AFFIRM.

BACKGROUND

This case stems from the 2001 robbery of an armored truck at the Dearborn Federal Credit Union (DFCU) in Dearborn, Michigan. The robbers killed a guard and stole $204,000

and the guard's gun. The robbery went unsolved for almost three years, until a jailhouse informant provided police with information. Eventually Watson and six others—Timothy O'Reilly, Khayyam Wilson, Norman Duncan, Archie Broom, Earl Johnson, and Henry Matthews—were arrested and charged.

The jailhouse informant, Baron Nix-Bey, was incarcerated in the Michigan Department of Corrections with O'Reilly. After he overheard O'Reilly discussing the DFCU robbery, he contacted the Detroit FBI hoping that the information he provided might merit some reward. The FBI arranged for Nix-Bey to record conversations between himself and O'Reilly using a recording device hidden in a portable radio. During one of these conversations, O'Reilly described the 2001 robbery in detail, naming several of his coconspirators. Watson and his codefendants were then indicted. Johnson was tried first and found guilty. This court affirmed in *United States v. Johnson*, 581 F.3d 320 (6th Cir. 2009). O'Reilly was also tried and convicted. Duncan, Broom, Wilson, and Matthews pleaded guilty.

Broom, Wilson, and Matthews testified against Watson at his trial. The story that emerges from their testimony is that Wilson, Johnson, and Watson had known each other since they met at work in 1994. In 2001, Johnson told Wilson and Watson of his idea to rob an armored truck. Watson then recruited O'Reilly and Duncan, both of whom had previously worked at Guardian Armored Security, an armored truck company. Johnson recruited Matthews during the final few days before the robbery, believing that a sixth person at the scene would be helpful. Broom was a friend of Duncan's who worked for U-Haul. Broom was not present for the robbery, but he provided the group access to a U-Haul van that they used during the robbery.

On December 12, 2001, the six men—Watson, O'Reilly, Duncan, Wilson, Johnson, and Matthews—made a first attempt to rob the armored truck. They met at Duncan's and drove to

the DFCU parking lot to wait for the armored truck to arrive, but aborted the robbery when the van's lights unexpectedly began flashing. Two days later, they returned and committed the robbery. The men again met at Duncan's house. They arrived at the DFCU at around 1:00 a.m. and waited with the engine running until the armored truck arrived at 2:30 a.m. Watson, Duncan, and O'Reilly left the van first, each carrying a shotgun. According to the plan, they were supposed to make the guards get down on the ground, while the other three men ran to collect the bags of money. Within seconds after Watson, Duncan, and O'Reilly left the van, Wilson and Matthews heard gunshots. Matthews and Johnson grabbed the money while Wilson got in the driver's seat. Once everyone made it back to the van, they drove away. Matthews learned on the drive home that a guard had been shot. The men divided up the proceeds at Johnson's house that night.

Nix-Bey testified regarding his conversations with O'Reilly and the recording was played for the jury. In the recorded conversation, O'Reilly discussed the 2001 robbery and stated that he and Watson shot the guard. O'Reilly also discussed a second armored-truck robbery that he committed in 2003 with Duncan and Broom.

Derrick Smith, LaTonya Smith, and Jerome Crutcher also testified for the prosecution. Derrick Smith was close with Earl Johnson at the time of the bank robbery. He testified that Johnson invited him to participate in the robbery but Smith did not take him seriously. After reports of the robbery surfaced in the media, Johnson admitted to Smith that he had been involved. Smith also testified that shortly after the robbery, he heard a conversation between Watson and Johnson during which Watson threatened to kill a coconspirator who had been "flashing money around," and who Watson feared had snitched to the police. LaTonya Smith was Duncan's girlfriend in 2001, and his wife at the time of Watson's trial. She testified that she

witnessed a conversation shortly after the robbery during which Watson made no comment when he heard Duncan ask O'Reilly if O'Reilly saw Watson shoot the guard. The district court admitted her testimony about the conversation over Watson's objection as an admission by silence on Watson's part. Jerome Crutcher had met Watson through his brother. Crutcher testified that he witnessed Watson attempt to sell his brother a shotgun shortly after the robbery and heard Watson state that he had used the gun when he "had to lay a guard down" during a robbery.

Watson presented his ex-wife's testimony that he was at home sleeping when the robbery occurred. He testified on his own behalf, and several of Watson's acquaintances and friends served as character witnesses. On November 22, 2011, the jury convicted Watson on all counts.

## DISCUSSION

Watson argues that (1) the trial court should have excluded as irrelevant and unfairly prejudicial portions of O'Reilly's recorded conversation with Nix-Bey; (2) he was denied a fair trial when the trial court admitted as an "admission by silence" LaTonya Smith's testimony that Duncan bragged to O'Reilly that Watson shot the guard; (3) he was denied a fair trial when during closing arguments the prosecution replayed excerpts of O'Reilly's conversation with Nix-Bey as though O'Reilly were responding to the prosecution's questions; and (4) the cumulative effect of these alleged errors denied him a fair trial.

I.    Admissibility of the Recording Excerpts

Watson argues that the district court should have excluded the portions of O'Reilly's recorded conversation with Nix-Bey during which O'Reilly discussed the 2003 bank robbery that he committed with Duncan and Broom, and O'Reilly "discussed the ways in which he prepared for his robberies and his knowledge and expertise in robberies of armored trucks."

We review the decision to admit the recording excerpts for plain error. *See United States v. Deitz*, 577 F.3d 672, 688 (6th Cir. 2009) ("[W]here a defendant fails to object at trial or 'does not state the specific ground for his evidentiary objection, and that ground is not apparent from the context, we review a newly raised objection under the plain-error standard.'") (quoting *United States v. Seymour*, 468 F.3d 378, 384 (6th Cir. 2006). Watson contends that we should review for an abuse of discretion because the district court admitted the evidence over his objection. But as the Government notes and the record evinces, Watson made other objections to the admissibility of the recording before the district court, but he did not make this one. Specifically, Watson filed a motion in limine objecting to admission of the recorded conversation in its entirety as a violation of the Confrontation Clause[1], and objecting to two of O'Reilly's statements during the conversation[2] as insufficiently self-incriminating to warrant an exception to the rule against hearsay. But the motion included no arguments regarding the relevance of or prejudice caused by O'Reilly's discussion of the 2003 robbery and his knowledge and expertise in robbing armored trucks, and Watson did not raise the objection during trial.

---

[1]The district court considered and rejected a materially identical objection to the admission of the recording at Johnson's trial, and this court affirmed. *See Johnson*, 581 F.3d at 325. Addressing the objection in this case, the district court applied this court's reasoning in *Johnson*, finding the Confrontation Clause inapplicable because O'Reilly's statements were nontestimonial, *i.e.*, "'a reasonable person in [O'Reilly's] position would not have anticipated his statement being used against [Watson] in investigating and prosecuting the crime.'" *See* Order at 3 (quoting *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004)); *see also Johnson*, 581 F.3d at 325 ("Because O'Reilly did not know that his statements were being recorded and because it is clear that he did not anticipate them being used in a criminal proceeding against Johnson, they are not testimonial, and the Confrontation Clause does not apply.").

[2]The two statements were (1) one in which O'Reilly stated that Watson had "killed many people" before he shot the guard during this robbery; and (2) one in which O'Reilly explained how he and Watson shot the guard and in what sequence. The Government stipulated to redaction of the first statement but not the second. The district court admitted the second over Watson's objection that the statements were not sufficiently self-inculpatory. Watson does not challenge the ruling on appeal.

When conducting plain-error review, we ask (1) whether error occurred; (2) whether the error was plain; (3) if so, whether it affected the defendant's substantial rights; and (4) even if all of those factors exist, whether the error "seriously affected the fairness, integrity or public reputation of judicial proceedings." *United States v. Jones*, 108 F.3d 668, 670 (6th Cir. 1997). We find plain error "'only in exceptional circumstances' and only where the error is so plain that the trial judge was 'derelict in countenancing it.'" *United States v. Cowart*, 90 F.3d 154, 157 (6th Cir. 1996) (quoting *United States v. Cox*, 957 F.2d 264, 267 (6th Cir. 1992)). The burden to prove plain error belongs to the defendant claiming it. *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004).

Watson contends that the statements were irrelevant and unfairly prejudicial because they had nothing to do with Watson's culpability for the 2001 robbery; rather they served only to "create a link between Mr. Watson and O'Reilly and *O'Reilly's* previous crimes." Watson also argues that the statements were confusing because "there are points at which O'Reilly does not make clear to which robbery he is referring and at some points he discusses details of the two robberies in conjunction." This made it more likely, he contends, that the jury would be "confused and misled to improperly consider details of the 2003 robbery as relating to the DFCU robbery and Mr. Watson's guilt." He argues that the prejudicial effect of the error was compounded because he did not have the opportunity to cross-examine O'Reilly to clarify "to the jury that Mr. Watson was not a participant in the 2003 robbery."

Watson has not demonstrated plain error. Evidence is relevant if it has any tendency to make a fact of consequence more or less likely than it would be without the evidence. Fed. R. Evid. 401. A district court may exclude relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue

delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. O'Reilly's statements showing knowledge of armored trucks were not without relevance. Wilson, Matthews, and Mary Perry[3] testified that O'Reilly and Duncan had worked at an armored truck company and the Government argued that Wilson recruited them to help plan the robbery precisely because of that experience. O'Reilly's statements regarding the 2003 robbery and his preparation for that robbery were not relevant to any fact of consequence in Watson's trial, and arguably were prejudicial because by making O'Reilly look worse, they made Watson look worse for associating with him. *See United States v. Lopez-Medina*, 461 F.3d 724, 741–42 (6th Cir. 2006) ("Evidence that demonstrates only "guilt by association," such as evidence of a family member's criminal history, is irrelevant to the question of a defendant's actual guilt."). But even assuming that *all* of the statements that Watson claims should have been excluded were admitted in error, Watson has not established that the error was plain or that it affected his substantial rights, *i.e.*, that it "affected the outcome of the district court proceedings." *United States v. Olano*, 507 U.S. 725, 734. This is so for several reasons.

First, evidence about the 2003 robbery had already been presented to the jury before O'Reilly's statement was played. Broom testified that he, Duncan, and O'Reilly committed the 2003 robbery. Watson did not object to Broom's testimony and, in fact, used Broom's participation in the robbery to impeach his credibility. Second, it is unlikely that the jury was misled or confused by discussion of the two robberies. The prosecution made clear during direct examination of Broom that Watson was not involved in the second robbery and that it occurred in 2003, after the robbery at issue here. And, contrary to Watson's argument, during the recorded conversation, O'Reilly and Nix-Bey consistently and clearly distinguished the two

---

[3]Perry supervised O'Reilly and Duncan when they worked at Guardian Armored Security.

robberies. O'Reilly repeated several times in response to prompting from Nix-Bey that only he, Broom, and Duncan were involved in the 2003 robbery, and that Watson was *not* involved. Third, although Watson could not cross-examine O'Reilly to clarify that Watson did not participate in the 2003 robbery, he had the opportunity to cross-examine Nix-Bey and Broom to clarify the point. And finally, fourth, the prosecution presented substantial other evidence of Watson's guilt, including the remainder of O'Reilly's conversation with Nix-Bey; Wilson's, Broom's, and Matthews's testimony describing Watson's participation; and Crutcher's and Derrick Smith's testimony regarding Watson's inculpatory post-robbery statements. For all of these reasons, we find that Watson has not shown that any error in admitting the recording excerpts was plain or that it affected his substantial rights.

II.     Admission by Silence

Watson next argues that he was denied a fair trial where the Government was able to elicit testimony from LaTonya Smith as an "admission by silence" on Watson's part, and referred to Watson's silence as an admission during closing arguments. The disputed testimony came just after Smith testified that she was at Duncan's house in December 2001when she first learned of the robbery:

Q:     So you were at the house.

A:     Yes, I was at the house and I was sitting at the table and Norman [Duncan] and O'Reilly and Mr. Watson, they was all at the door in front of the door and I overheard Norman say that did you see my cousin shoot him or to that sort.

Q:     And was Watson standing there when Duncan said that?

A:     Yes.

Q:     Did Watson hear Duncan say that?

A:     He was standing right there.

Q:      Did he deny that he---

A:      He didn't say anything.

Q:      How soon after the robbery did this occur?

A:      Two or three days I think, three days.

Watson had moved to exclude Smith's testimony about Duncan's question as hearsay. The Government argued that Watson's silence in the face of the question rendered it an adoptive admission and the district court agreed.

"We review a district court's decision to admit evidence over a hearsay objection de novo." *United States v. Jinadu*, 98 F.3d 239, 244 (6th Cir. 1996). A statement that would otherwise be inadmissible hearsay is admissible against a party if it is a statement "the party manifested that it adopted or believed to be true." Fed. R. Evid. 801(d)(2)(B). A party may manifest an adoption of a statement through language, conduct, or silence. *Jinadu*, 98 F.3d at 244. To determine whether silence indicates adoption of a statement, "the primary inquiry is whether the statement was such that, under the circumstances, an innocent defendant would normally be induced to respond, and whether there are sufficient foundational facts from which the jury could infer that the defendant heard, understood, and acquiesced in the statement." *Id*.

The district court did not err by admitting Smith's testimony. First, there were sufficient facts for a jury to infer that Watson heard and understood when Duncan asked O'Reilly if he saw his "cousin" shoot the guard. Broom had testified earlier that Duncan used the term "cousin" to refer to Watson, and Smith testified on cross-examination that Duncan did not use that term for anyone else. Smith testified that Watson was "standing right there" when Duncan posed the question. Although she also testified in cross-examination that Watson was only in the room for

"a couple of minutes," she did not contradict her testimony that Watson was in the room when Duncan posed the question.

Second, an innocent person "would . . . be induced to respond" if, as happened here, someone stated in his presence that he shot the victim of an unsolved murder committed a few days prior. *Jinadu*, 98 F. 3d at 244. Watson argues, citing *United States v. Williams*, 445 F.3d 724, 735 (4th Cir. 2006), that Duncan's question to O'Reilly was not sufficiently accusatory for Watson's silence to be an admission. *See id.* (finding the question "did you kill somebody?" insufficiently accusatory to render the defendant's silence an adoptive admission). But Duncan's question to O'Reilly is distinguishable from the question in *Williams*; it included as its premise that Watson killed the guard and only asked whether O'Reilly saw it. *See id.* (finding distinguishable questions in which there is an "accusatory statement implicit in the question," *e.g.*, asking *why*, not whether, the defendant killed someone).

Watson also argues that it was error to construe Duncan's question as an adoptive admission because the question was not directed at Watson. But a statement or question need not be directed at the defendant for it to be admissible as the defendant's admission. *See, e.g.*, *United States v. Grunsfeld*, 558 F.2d 1231, 1237 (6th Cir. 1977) (defendant's silence when introduced to third party as his codefendant's "business partner" was an adoptive admission); *United States v. Hoosier*, 542 F.2d 687, 688 (6th Cir. 1976) (defendant's silence in face of girlfriend's statement to third party regarding "sacks of money" in their hotel room was an adoptive admission).

Watson further argues that he "is fully entitled to be free from compelled self-incrimination under the Fifth Amendment," and that applying the adoptive admission concept in this context infringes on that right. But there is no blanket prohibition against finding an

admission by silence in the criminal context. *See* Advisory Committee's Notes on Fed. R. Evid. 801(d)(2)(B) (noting that Supreme Court decisions "relating to custodial interrogation and the right to counsel appear to resolve [Fifth Amendment] difficulties. Hence the rule contains no special provisions concerning failure to deny in criminal cases."). And Watson does not identify any authority for the contention that a defendant's Fifth Amendment rights are implicated when evidence of his silence during a conversation unconnected to any police investigation, custody, or interrogation is introduced against him at trial. *Cf. Combs v. Coyle*, 205 F.3d 269, 283 (6th Cir. 2000) (the Fifth Amendment's privilege against self-incrimination extends "to persons in custody or charged with a crime[,]" and suspects "questioned during the investigation of a crime").

Further, were we to find Smith's testimony inadmissible, we would find the error harmless because the jury heard substantial other evidence that Watson shot the guard. Crutcher testified that he heard Watson state affirmatively that he "had to lay a guard down" during a robbery. O'Reilly described the shooting and Watson's role in it in detail during the recorded conversation. Wilson testified that when the conspirators discussed the shooting as they drove away from the scene, Watson stated that "the guy went for his gun." In addition, Derrick Smith testified that he heard Watson threatening to kill the coconspirator who Watson suspected had snitched. In light of these more explicit admissions, we find it unlikely that Latonya Smith's testimony affected the outcome of Watson's trial. *See McCombs v. Meijer, Inc.*, 395 F.3d 346, 358 (6th Cir. 2005) (the harmless-error standard requires reversal when the appellate court "lacks a fair assurance" that the error did not affect the outcome of the trial) (internal quotation marks omitted).

III.    Prosecutorial Misconduct

Watson's prosecutorial misconduct allegation stems from the Government's use of the O'Reilly recording in closing arguments. Specifically, during closing arguments the prosecutor asked a series of questions about the crime, as though he were questioning O'Reilly, *e.g.*, "How many people were there, Mr. O'Reilly?" After each question, the prosecutor played an excerpt from the recording as O'Reilly's response. Watson argues that presenting O'Reilly's statements in this manner constituted prosecutorial misconduct warranting a new trial because "it created the illusion that O'Reilly himself was testifying . . . and likely caused the jurors to unduly consider [his] statements as factual responses."[4]

We find no error. Watson cites *Abela v. Martin*, 380 F.3d 915 (6th Cir. 2004), to support the argument, but *Abela* is of no assistance to him. In *Abela*, the prosecutor "invented" a conversation during closing arguments in which he attributed statements to the defendant. *Id.* at 929. Noting that it would be misconduct for a prosecutor to argue facts not in evidence, *e.g.*, to offer as direct quotes statements that were never made, we rejected the contention that it had happened in that case because, in context, it was clear that the prosecutor did not purport to quote from an actual conversation. *Id.* (finding no error because "the prosecutor prefaced this part of his argument by advising the jury: 'and exactly what was said probably we'll never know but probably went something like this . . . .'"). So too here. The excerpts played were O'Reilly's *actual* statements in his conversation with Nix-Bey. They had already been admitted and played for the jury. Nix-Bey had testified to the context in which the statements were made, and during

---

[4]In his reply brief, Watson changes his argument and contends that using the recording in this manner violated the Confrontation Clause. Watson forfeited any Confrontation Clause challenge on appeal by not raising the issue in his opening brief. *United States v. Johnson*, 440 F.3d 832, 845–46 (6th Cir. 2006) ("'[A]n appellant abandons all issues not raised and argued in its initial brief on appeal.'") (citation omitted). We further note that Watson did not object to the argument during closing.

closing arguments the prosecutor urged the jury to listen to the entire tape during deliberations. Under these circumstances, it is difficult to imagine that the jury could have been misled into thinking that O'Reilly made the statements in the context of an interrogation.

IV.     Cumulative Error

Finally, Watson argues that the combined effect of the foregoing alleged errors compromised the fundamental fairness of his trial. "Errors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair." *Walker v. Engle*, 703 F.2d 959, 963 (6th Cir. 1983). We reject the argument. We have scarcely found that any of Watson's allegations amount to error, or prejudiced Watson, and, as noted, the Government presented substantial, unchallenged evidence of his guilt. *See United States v. Walker*, 506 F. App'x 482, 488 (6th Cir. 2012) ("A trial need not be 'perfect' to withstand a due process challenge."). Accordingly, we find that the cumulative effect of any errors did not render Watson's trial fundamentally unfair.